**Grachik ROSTOMIAN; Anik Rostomian, Petitioners,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 98–70564.

United States Court of Appeals, Ninth Circuit.

Submitted April 4, 2000 *

Filed May 3, 2000

Joseph J. Rose, Law Office of Rose, Rose & Davis, Los Angeles, California, for the petitioners.

John M. McAdams, Jr., United States Department of Justice, Office of Immigration Litigation, Washington, D.C., for the respondent.

Before: REINHARDT and O'SCANNLAIN, Circuit Judges, and SCHWARZER,** Senior District Judge.

Opinion by Judge SCHWARZER; Dissent by Judge REINHARDT

---

* The panel unanimously finds this case suitable for decision without oral argument. Fed. R.App. P. 34(a)(2); 9th Cir. R. 34-4.

** The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

SCHWARZER, Senior District Judge:

Husband and wife Grachik and Anik Rostomian, eighty and seventy-seven years old, respectively, are natives and citizens of Armenia. They seek review of an order of the Board of Immigration Appeals (Board) dismissing their appeal from the immigration judge's order denying their petition for asylum and withholding of deportation. They claim past persecution and a well-founded fear of persecution on account of their ethnicity and Christian beliefs, arising from hostilities on the border between Armenia and Azerbaijan in the Nagorno–Karabakh region.[1]

■ To establish eligibility for asylum, the Rostomians must prove "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *Cordon–Garcia v. INS,* 204 F.3d 985, 990 (9th Cir.2000). The Board concluded that the Rostomians failed to establish eligibility for asylum. We review the Board's decision under the deferential "substantial evidence" standard. *See Singh v. INS,* 134 F.3d 962, 966 (9th Cir.1998). Under that standard, the Rostomians' petition must be denied unless the evidence they presented "was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Abedini v. INS,* 971 F.2d 188, 191 (9th Cir.1992).

■ Mr. Rostomian testified that he sustained knife wounds during an Azeri attack on the Armenian residents of the border town where the Rostomians lived. The Board found that the Rostomians did not establish that the attack was anything more than an act of random violence during a period of significant strife. This is insufficient to establish persecution. *See Singh,* 134 F.3d at 967. The Board's finding is supported by substantial evidence. Thus, the Rostomians' claim that they are

entitled to a presumption of a well-founded fear of persecution based on past persecution fails.

■ On the merits, the Rostomians' claim of a well-founded fear of persecution fails for the same reason. They argue only that "old animosities between Azeris and Armenians still exist." This is insufficient to establish a well-founded fear of persecution. *See id.*

■ The Board's finding that the Rostomians did not establish eligibility for asylum is supported by substantial evidence. Because they fail to meet the lesser standard for eligibility for asylum, the Rostomians necessarily fail to establish eligibility for withholding of deportation. *See Fisher v. INS,* 79 F.3d 955, 961 (9th Cir. 1996) (en banc).

PETITION DENIED.

REINHARDT, Circuit Judge, dissenting:

I respectfully dissent from the majority's decision to deny the petition for review. Grachik and Anik Rostomian contend that they suffered persecution because they are Christians and Armenians. Mr. Rostomian testified at their deportation hearing that in the fall of 1991, while living on the border between Armenia and Azerbaijan, near the disputed region of Nagarno–Karabakh, Muslim Azeris beat him and cut his back with knives. Thereafter, following a brief period of quiet, the Azeris came back "constantly," trying to force the Rostomians to flee. Because there were no police or military forces to protect them, the Rostomians ultimately fled their village and, after stopping temporarily in two other locations in Armenia, came to the United States, where their only daughter lives.

---

**1.** Unlike petitioner in *Colmenar v. INS,* 210 F.3d 967 (9th Cir.2000), petitioners raise no due process claims and do not contend that

they were denied a full and fair hearing. Our independent examination of the record confirms that they were not.

The majority defers to the BIA's finding that the Rostomians did not adequately establish that they were victims of past persecution on protected grounds, rather than "victims of random violence during a period of significant strife." The BIA did not question the Rostomians' credibility; to the contrary, it noted that they presented "a sympathetic fact situation." The BIA concluded, however, that the Rostomians' asylum claim failed because Mr. Rostomian's testimony about the attack was not sufficiently specific or detailed. "Perhaps understandably," it wrote, "[Mr. Rostomian] could not identify his assailants, other than to state that they were 'Azeris,' but he did not relate in any detail when this act of violence occurred or its attendant circumstances, [and] he provided no corroborative documentary evidence in support of his claim . . . ."

It is well established, however, that documentary evidence is not required to corroborate an asylum claim. "[P]ersecutors are hardly likely to provide their victims with affidavits attesting to their acts of persecution." *Ramos–Vasquez v. INS*, 57 F.3d 857, 862 (9th Cir.1995) (quoting *Bolanos–Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir.1984)). A petitioner's testimony about past persecution can be sufficient.

Here, to the extent that the Rostomians' account lacked detail, this was the fault of the Immigration Judge (IJ) who conducted their hearing. The Rostomians are an elderly couple. At the time of the hearing, the husband was 77 years old, and the wife was 74. They spoke through an Armenian interpreter. In presenting their case for asylum, their attorney began by questioning Mrs. Rostomian. The IJ, however, immediately—and senselessly—required the attorney to address Mr. Rostomian instead:

Attorney: Why would Azeris want to harm you?

Mrs. Rostomian: Because we are Christian Armenians. We are neighbors with the Azeris and they called us gabors (phonetic) which is like a foreigner. They were beating us. They were asking us to leave.

IJ: Could you answer me another question? Who is making the claim for asylum? The respondent's wife. The female respondent or the male respondent.

Attorney: The male respondent is the —

IJ: Is there any reason why you can't ask him those questions?

Attorney: Yes, there is.

IJ: He's the one putting forward the claim.

Attorney: There is, Your Honor. That's why —

IJ: What is the reason?

Attorney: The reason is that Mr. Rostomian is an elderly gentleman and he has difficulty remembering a lot of things that happened, and his wife is more competent to —

IJ: Do you have some medical evidence to —

Attorney: I don't have medical evidence today.

IJ: Then why should I accept what you say?

Attorney: We will do whatever the Court —

IJ: Mr.Mr. Rostomian, when did you leave Armenia?

Mr. Rostomian: 1993.

IJ: Again, I will admonish the female respondent to not say a word when her husband is being questioned, and vice versa. . . . [1]

---

1. Although the asylum application was filed in the name of the husband, the request for asylum expressly included the wife. There would have been little point in filing two separate applications, given the facts of the case. In any event, I am unaware of any reason why the wife should not have been permitted to present the principal testimony regarding the asylum claim, so long as the parties and the IJ were then permitted to question the husband to the extent they deemed necessary.

After asking a few more questions, the IJ stated that Mr. Rostomian "understands completely what I'm saying" and directed the Rostomians' attorney to question him alone. Before allowing him to do that, however, the IJ announced that he had already decided their claim:

IJ: I will point out that the war [between Armenia and Azerbaijan] is over. I don't know what the claim is here. I don't know what the basis of this claim is. I read this application. I see no basis for a claim to asylum in the United States.

Attorney: The racial tensions.

IJ: That doesn't do it. But go ahead.

Mr. Rostomian testified that Muslims threatened and beat Christians in his village in Armenia, and that in the fall of 1991 a group of Azeri soldiers and villagers attacked him, cut his back with knives, and told him to leave the village. Before Mr. Rostomian could provide more information about this assault, the IJ interrupted and took control of the questioning:

IJ: After that, did anything else happen?

Mr. Rostomian: Yes. For a while they were quiet and then they were coming back. It was constant. They were trying us [sic] to leave the village.

IJ: Did you leave the village and move?

Mr. Rostomian: Yes.

IJ: When did you leave your village and move?

Mr. Rostomian: That was in the fall of 1991 or the beginning of '92.

The IJ asked Mr. Rostomian about the town in Armenia where the couple went after fleeing their village, and then about their arrival in the United States.

IJ: What was your purpose in coming to the United States?

Mr. Rostomian: The purpose was to live a free [life] and normal life.

IJ: You mean you came to the United States to stay. Is that right?

Mr. Rostomian: We came to see my daughter. We saw that it is a nice country and they love people.

IJ: So when is it—when did you decide you were going to stay in this country?

Mr. Rostomian: When we came to the United States —

IJ: What?

Mr. Rostomian:—right at the airport we realized that this is a very warm country.

IJ: At the airport you realized this.

Mr. Rostomian: Even if we go back, either they're going to kill us or they're going to open the threats and beatings. If I go back to my village, it's going to be the same thing all over again.

IJ: Um-hum. What time—what time of day if you recall did you arrive at Los Angeles International Airport on June 3, 1993? . . . .

Thus, at three separate points the IJ foreclosed Mr. Rostomian from providing details about his claim of persecution: first, when he described the knife assault he suffered at his village in Armenia; second, when he testified that his attackers were "coming back" to the village on a "constant" basis; and third, when he stated that he and his wife would be assaulted or even murdered if they returned to the village now. The Rostomians cannot be blamed for failing to provide specific information in support of their claim of persecution when the IJ assumed control of the questioning and prevented them from doing so. At no point did the IJ or government attorney ask Mr. Rostomian any questions about the 1991 assault that he was unwilling or unable to answer. Nor did they ask for further details. On cross-examination, Mr. Rostomian explained that at the time of his assault in 1991, there were no doctors to treat his injuries and no police or soldiers to maintain order. "Whoever wanted to do anything, they were doing it," he testified. "I mean there was no control." The government neither contradicted Mr. Rostomian's testimony

nor offered any evidence that conditions have improved for Armenians living near Nagorno–Karabakh. It failed even to introduce any country conditions report.[2]

Individuals subject to deportation proceedings are entitled to a full and fair hearing and a reasonable opportunity to present their case. *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir.2000); *Jacinto v. INS*, 208 F.3d 725, 727–29 (9th Cir.2000); *Campos–Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir.1999). These rights arise from not only the Due Process Clause of the Fifth Amendment, but also specific statutory and regulatory provisions. *See* 8 U.S.C. § 1229a(b)(1), (4); 8 C.F.R. §§ 240.10(4), 242.16(a).

Here, these safeguards were undermined by the IJ in a number of respects. The IJ did not provide the Rostomians with a reasonable opportunity to present the specific information that, according to the BIA and the majority, was required to support their claim.[3] He prevented the more competent of the two, Mrs. Rostomian, from presenting the principal testimony at the hearing, clearly a permissible method of providing evidence. He never warned the Rostomians that he considered Mr. Rostomian's account lacking in detail, and he in fact prevented Mr. Rostomian from providing such detail through his control of the questioning. Having stated his view of the asylum claim at the outset, the IJ "behaved not as a neutral fact-finder interested in hearing the petitioner's evidence, but as a partisan adjudicator seeking to intimidate" the Rostomians and their attorney. *Colmenar*, 210 F.3d at 971.

*Colmenar*, I should note, involved the same IJ—Immigration Judge Jay Segal—who presided over the Rostomians' deportation hearing. In that case, this court said, only last month, "the IJ did his best to prevent a full examination of Colmenar." 210 F.3d at 971. At the Rostomians' hearing, Judge Segal's conduct was remarkably similar. Once again, his performance served to obstruct the Rostomians' efforts to tell their story. Indeed, rather than attempt to ascertain fully the facts underlying the Rostomians' claim of persecution, Judge Segal directed his energies to impugning their motives for seeking asylum. Without any apparent cause, he questioned Mr. Rostomian about their sources of income in Armenia and their receipt of social security insurance payments in the United States. He revealed his motivation for asking these questions in the conclusion of his oral decision:

> I'm satisfied that the reason why the respondent applied for asylum basically was to receive this money. I am only pointing these facts out to determine whether the respondents have abused the law of the United States by making fraudulent claims in connection with whether or not to grant voluntary departure. However, as the Government has not pursued it, I will grant both respondents voluntary departure.

> I feel compelled to note, however, that the asylum laws of the United States were not designed to provide access to this country by elderly family members who have no basis for a claim at all so that they could receive federal funds.[4]

**2.** The IJ referred in his oral decision to a 1994 U.S. State Department country conditions report, but there is nothing in the record reflecting that any such report was introduced or otherwise judicially noticed. *See Fisher v. INS*, 79 F.3d 955, 963–64 (9th Cir. 1996).

**3.** As the majority observes, the Rostomians did not make a due process claim in their petition for review. I would grant their petition not for denial of due process, but instead on the more elementary ground that the rele-

vant asylum statute and regulations prohibit denying an applicant eligibility for failure to present evidence that the IJ does not allow. The government may not frustrate an asylum applicant's efforts to establish the facts and then deny him relief on the ground that the facts he presented were not sufficiently specific. So doing renders the decision arbitrary and capricious, and contrary to law.

**4.** The BIA did not comment on the IJ's theory. In its brief to this court, however, the government cites the IJ's finding that "Mr.

The IJ's performance in this case was deplorable. There is no basis whatsoever—nothing—for the assertion that the Rostomians came to the United States to collect social security payments. To the contrary, the record shows that they were supporting themselves in Armenia: Mr. Rostomian received a retirement pension from the watch factory where he had worked for 39 years, and Mrs. Rostomian received a salary for her work as a comptroller in a bank. They now live in the United States with their only daughter, a permanent resident eligible for citizenship. To conclude from these facts that the Rostomians "abused the law of the United States by making fraudulent claims" is unfounded and injudicious. The observation of the court in *Colmenar* applies equally well here: "Judges do little to impress the world that this country is the last best hope for freedom by displaying the hard hand and closed mind of the forces asylum seekers are fleeing." 210 F.3d at 973.

Lastly, I must note the absurdity and potential inhumanity of the government's efforts in this case. Mr. Rostomian is now 80 years old; Mrs. Rostomian is 77. No one (other than the IJ, perhaps) disputes that Mr. Rostomian suffered a terrible act of violence in 1991, or that he and his wife were forced to flee their home in Armenia. Their only child lives in the United States, and they have stayed with her for the past seven years. Leaving aside the fundamentally unfair treatment they received at their deportation hearing, what purpose does it serve to send this elderly couple back to Armenia?

Even though the majority concludes that, on the record before us, the Rostomians failed to establish persecution on account of a protected ground under 8 U.S.C. § 1101(a)(42)(a), the Attorney General still retains discretion as to when—and indeed whether—deportation will take place. Perhaps it is not too much to hope

that she will exercise that discretion wisely.

I respectfully dissent.

and Mrs. Rostomian applied for asylum in order to remain in the United States and

receive money" and characterizes it as "unchallenged."