**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARJORIE KONDA LOLONG,
                              *Petitioner,*

v.

ALBERTO R. GONZALES, Attorney
General,
                              *Respondent.*

No. 03-72384

Agency No.
A77-427-355

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
October 5, 2006—San Francisco, California

Filed May 7, 2007

Before: Mary M. Schroeder, Chief Circuit Judge,
Harry Pregerson, Pamela Ann Rymer, Andrew J. Kleinfeld,
Michael Daly Hawkins, Sidney R. Thomas,
Barry G. Silverman, M. Margaret McKeown,
Raymond C. Fisher, Ronald M. Gould, Richard A. Paez,
Richard C. Tallman, Johnnie B. Rawlinson, Jay S. Bybee,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Bybee;
Partial Concurrence and Partial Dissent by Judge Thomas

5037

**COUNSEL**

Robert B. Jobe, Hilari Allred, Law Office of Robert B. Jobe, San Francisco, California, for petitioner Marjorie Lolong.

Jonathan F. Cohn & Isaac R. Campbell, Department of Justice, Washington, D.C., for the respondent.

**OPINION**

BYBEE, Circuit Judge:

Marjorie Konda Lolong petitions for review of a decision by the Board of Immigration Appeals ("BIA") denying her application for asylum and granting her voluntary departure. In *Molina-Camacho v. Ashcroft*, 393 F.3d 937 (9th Cir. 2004), we held that we lack jurisdiction to review the BIA's decisions in such cases because the BIA lacks the authority to issue final orders of departure, and the Immigration and Naturalization Act ("INA") conditions our jurisdiction on the existence of such an order. Until recently, a petitioner in Lolong's position could still seek habeas relief in district court, but in the REAL ID Act of 2005, Congress eliminated this form of relief in immigration cases. *See* 8 U.S.C. § 1252(a)(5). Together with our prior decisions, this statutory change leaves petitioners in Lolong's position with no opportunity to obtain judicial review of the BIA's disposition of their cases. We reheard this case en banc to revisit our prior jurisprudence because this lack of judicial review raises serious constitutional concerns. Having decided that our prior interpretation of the BIA's power under the INA was overly narrow, we overrule *Molina-Camacho* and determine that we do have jurisdiction to review the BIA's decision in such cases. We further conclude that substantial evidence supports the BIA's denial of Lolong's asylum claim. Accordingly, we deny the petition for review.

I

Marjorie Lolong is an Indonesian woman of ethnic Chinese descent. She is also a Christian. Lolong first entered the United States as a student in 1990. In May 1998, when she was still a student in this country, Indonesia experienced the worst anti-Chinese rioting in its history. She applied for asylum in December 1998, after learning that one of her friends had been raped and her uncle had been severely beaten during the violence. During her removal proceedings, Lolong conceded removability, and the Immigration Judge ("IJ") determined that "removability has been established by clear and convincing evidence." However, in November 2000, the IJ held that Lolong was eligible for asylum, finding her testimony fully credible and her fear of future persecution to be both subjectively genuine and objectively reasonable. The Immigration and Naturalization Service ("INS") appealed and, in a divided opinion, the BIA concluded that Lolong could not establish that her fear of future persecution in Indonesia was objectively reasonable because there was evidence that the Indonesian government had taken steps to bring militant Islamic groups—which were largely responsible for the outbreaks of religious and ethnic violence—under control. Consequently, the BIA sustained the appeal, vacated the IJ's decision, and granted Lolong voluntary departure. Lolong then petitioned this court for review. A panel of our court granted Lolong's petition. 400 F.3d 1215 (9th Cir. 2005). We vacated that decision, 452 F.3d 1027 (9th Cir. 2006), and heard oral argument.[1]

II

As an initial matter, we must address the question of our jurisdiction to review Lolong's petition. In two prior deci-

---

[1]Although we do not often comment on the quality of arguments, we would like to thank both counsel for aiding the court through their excellent advocacy in briefing and during oral argument.

sions, we have narrowly construed the BIA's authority under the INA both to enter an order of removal in the first instance, and, as is the case here, to reinstate a prior order of removal issued by the IJ. In the first of these decisions, *Noriega-Lopez v. Ashcroft*, we noted that the BIA lacks statutory authority to enter orders of removal and held that any attempt by the BIA to do so was a "legal nullity." 335 F.3d 874, 883-84 (9th Cir. 2003) (internal quotation marks omitted). Because our jurisdiction is limited to the review of final orders of removal, 8 U.S.C. § 1252(a), we held that, where the BIA issues an order of removal in the first instance, there is no valid final order of removal and consequently no jurisdiction in this court to review that legal nullity, *Noriega-Lopez*, 335 F.3d at 884-85. We concluded in that case that the petitioner had properly sought collateral review of the BIA's order of removal via a habeas petition filed in the district court and that we had jurisdiction to review the district court's disposition of that petition. *Id.* at 880-81.

**[1]** In *Noriega-Lopez*, we expressly reserved the question of this court's jurisdiction over petitions for review in cases where the IJ has determined "that an alien is removable . . . but grants relief from removal, and the BIA then rejects the grant of relief." *Id.* at 884 n.10. In *Molina-Camacho v. Ashcroft*, 393 F.3d 937 (9th Cir. 2004), however, we answered that question in the negative. In that case, as here, the alien conceded removability, but the IJ granted his request for cancellation of removal under 8 U.S.C. § 1229b(b)(1)(D). *Id.* at 938-39. The INS appealed, and the BIA reversed, holding that Molina-Camacho had not demonstrated that removal would cause the "exceptional and extremely unusual hardship" to his family that the INA requires for cancellation of removal. *Id.* at 939. The BIA then ordered him removed to Mexico. *Id.*

**[2]** Molina-Camacho petitioned for review by this court, but, extending the principles articulated in *Noriega-Lopez*, we held that the BIA's removal order was ultra vires and that we therefore lacked jurisdiction. *Id.* at 939-42. We noted that the

INA extends authority to enter removal orders only to special inquiry officers and not to the BIA. *Id*. at 940. Moreover, we noted that the BIA's role under the governing regulations is limited to "appellate review of immigration judges' decisions and other administrative adjudications." *Id*. (internal quotations omitted). Finally, we rejected the government's argument that the finding of removability before the IJ was equivalent to an order of removability because this argument "conflates the BIA's uncontested *substantive* power to reverse a finding of removability or eligibility for cancellation of removal on appeal with the *procedural* power to issue the order of removal that results from such a reversal." *Id*. at 941. Instead of simply dismissing the petition, however, we chose to construe it as a petition for habeas relief under 28 U.S.C. § 2241 and transferred it to the district court. *Id*. at 942.

**[3]** The procedural posture of Lolong's petition is essentially identical to that in *Molina-Camacho* and presents the same jurisdictional conundrum. Lolong conceded removability before the IJ, and, based on this concession, the IJ held that Lolong was removable but granted her application for asylum. The BIA reversed, but rather than remanding Lolong's case to the IJ for entry of an order of removal, the BIA itself granted her voluntary departure.

**[4]** Despite this similarity to *Molina-Camacho*, however, we no longer have the option of construing the petition for review as a request for habeas relief and transferring the matter to the district court. In the REAL ID Act of 2005, Congress eliminated collateral review of orders of removal, leaving direct petition to this court the sole avenue for review of the BIA's rulings. 8 U.S.C. § 1252(a)(5) (stating that "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this Act"). Thus, the REAL ID Act and our decision in *Molina-Camacho* together operate to deprive Lolong of any

avenue to seek review of the BIA's decision, leaving her in legal limbo.

[5] This limbo—in which the petitioner is subject to a void order of removal but has no judicial remedy—may raise serious constitutional concerns because the Suspension Clause "unquestionably" requires "some judicial intervention in deportation cases." *INS v. St. Cyr*, 533 U.S. 289, 300 (2001) (internal quotations omitted); *see* U.S. Const. art. I, § 9, cl. 2. Before we conclude that Congress intended to eliminate all possible relief in the REAL ID Act and thereby "give rise to [these] substantial constitutional questions," *St. Cyr*, 533 U.S. at 300, it is prudent for us first to review our own precedent to confirm that we have correctly interpreted the INA and the authority that statute grants to the BIA. Such a review, coupled with a close examination of the INA, now convinces us that nothing in that statute mandates the result we reached in *Molina-Camacho*.

[6] The IJ's grant of relief, whether in the form of asylum or withholding of removal on other grounds, necessarily requires the IJ to have already determined that the alien is deportable. Under the INA, this determination by the IJ constitutes an "order of deportation." 8 U.S.C. § 1101(a)(47) (defining an "order of deportation" to include both an "order . . . concluding that the alien is deportable" and one "ordering deportation").[2] Thus, where the BIA reverses an IJ's grant of relief that, by definition, follows an initial determination by the IJ that the alien is in fact removable, an order of deportation has already been properly entered by the IJ. In such cases, therefore, the BIA does not enter an order of deporta-

---

[2]In this context, the terms "deportable" and "deportation" can be used interchangeably with the terms "removable" and "removal," respectively. *See Noriega-Lopez*, 335 F.3d at 882 n.5. *Compare* 8 U.S.C. § 1101(a)(47) (defining an "order of deportation"), *with* 8 U.S.C. § 1252(a)(1) (providing for "[j]udicial review of a final order of removal"), *and* 8 U.S.C. § 1227(a) (defining classes of aliens as "deportable" pursuant to an order of removal).

tion *in the first instance* when it orders the alien removed. Rather, the BIA simply reinstates the order of removal that has already been entered by the IJ and that would have taken effect but for the IJ's subsequent cancellation of removal. Reinstating a prior order of removal by eliminating the impediment to that order's enforcement is entirely consistent with the BIA's appellate role.

This reasoning is also consistent with the approach adopted by all of our sister circuits to have considered this issue. *See, e.g.*, *Lazo v. Gonzales*, 462 F.3d 53, 54-55 (2d Cir. 2006) (per curiam) (stating that the BIA decision "removed an impediment to the removal that was ordered by the IJ" and disagreeing with *Molina-Camacho*); *Delgado-Reynua v.Gonzales*, 450 F.3d 596, 601 (5th Cir. 2006) (holding same); *Solano-Chicas v. Gonzales*, 440 F.3d 1050, 1054 (8th Cir. 2006) (holding that "where the BIA reverses the IJ's order granting cancellation of removal, the BIA, in essence, gives effect to the IJ's order of removability, for the BIA decision eliminates the impediments to removal" and disagreeing with *Molina-Camacho*). For example, in *Delgado-Reynua*, the Fifth Circuit noted that the IJ's grant of cancellation of removal "rested upon the predicate determination that [the petitioner] was deportable." 450 F.3d at 600. This initial determination constituted an "order of removal" as defined in the INA, *id.* (citing 8 U.S.C. § 1101(a)(47)), and the BIA's subsequent reversal of the "IJ's grant of discretionary relief . . . merely eliminated 'impediments to removal' and effected the original removal order," *id.* at 601. Thus, the BIA's actions were entirely within the scope of its powers under the INA, and the surviving order of removal was both final and valid and therefore reviewable under 8 U.S.C. § 1252(a). *See id.*

**[7]** Because our decision in *Molina-Camacho* adopted an overly narrow interpretation of the BIA's authority and did not properly construe the effect of the BIA's reversal of the IJ's decision to cancel removal after having found the alien removable, we overrule it. Instead, we hold that where the IJ

has previously determined that the alien is removable but grants cancellation of removal, the BIA's decision to reverse the cancellation of removal reinstates the initial finding of removability, which, under the statute, is effectively an order of removal. 8 U.S.C. § 1101(a)(47). Because Lolong conceded removability and the IJ found that clear and convincing evidence supported a finding of removability, a final order of removal was entered. We therefore have jurisdiction to consider her petition for review of the BIA's reinstatement of that order.

## III

## A

Having determined that we have jurisdiction over Lolong's petition for review, we now address the merits of her claim. We review the BIA's determination that the petitioner does not have an objectively reasonable fear of persecution for substantial evidence. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). We must uphold the BIA's determination unless "the evidence not only supports, but *compels* the conclusion that the asylum decision was incorrect." *Kataria v. INS*, 232 F.3d 1107, 1112 (9th Cir. 2000) (emphasis added). Even if we might have reached a conclusion different from that reached by the BIA, we may not reverse unless we determine that any reasonable factfinder would have been compelled to reach that conclusion. *Cordon-Garcia v. INS*, 204 F.3d 985, 990 (9th Cir. 2000); *Prasad v. INS*, 47 F.3d 336, 340 (9th Cir. 1995).

## B

**[8]** An alien is eligible for asylum relief if she can prove that she is a refugee, which she can establish by proving either actual past persecution or a well-founded fear of future persecution. *Cordon-Garcia*, 204 F.3d at 990. To demonstrate a well-founded fear of future persecution, the alien must estab-

lish that her fear is both subjectively genuine and objectively reasonable. *Velarde v. INS*, 140 F.3d 1305, 1309 (9th Cir. 1998). The petitioner's own testimony, if credible, is sufficient to establish that she has a subjectively genuine fear of future persecution. *Id.* at 1310. The objective component is more demanding and "requires credible, direct, and specific evidence," *Cordon-Garcia*, 204 F.3d at 990, that the petitioner faces an individualized risk of persecution or that there is a pattern or practice of persecution against similarly situated individuals. 8 C.F.R. § 208.13; *Sael v. Ashcroft*, 386 F.3d 922, 925 (9th Cir. 2004). Persecution is not limited to government-sponsored violence; it can also include "[d]iscrimination, harassment, and violence by groups that the government is unwilling or unable to control." *Singh v. INS*, 94 F.3d 1353, 1359 (9th Cir. 1996).

[9] Lolong has satisfied her burden of showing a genuine subjective fear of future persecution. In her testimony before the IJ, she described her fears and gave specific examples of violent incidents, some involving her friends and family, that have given rise to her fears. Moreover, the IJ expressly noted that Lolong testified credibly and was entirely forthright throughout her removal proceedings. In short, there is no reason to doubt that Lolong's fears of persecution should she return to Indonesia are subjectively genuine.

The dispute instead centers on whether her fears are objectively reasonable. The IJ, citing the experiences of Lolong's family and friends during the riots as well as the Indonesian government's apparent unwillingness or inability to control the militant Islamist groups responsible for much of the anti-Chinese and anti-Christian violence, determined that Lolong's fears were in fact objectively reasonable. According to the IJ, even though most Chinese Christians in Indonesia were not subject to physical attacks, occasional continuing violence was sufficient to show that the government could not or would not protect the Chinese Christian population generally and that Lolong's fears were therefore objectively reasonable.

Reviewing the IJ's factual findings de novo, however, the BIA found otherwise. The BIA concluded that, absent evidence that the Indonesian government was either unable or unwilling to control these militant groups, "the mere fact that some attacks on Chinese or on Christians continue to occur" was insufficient to support a finding that Lolong's fear of future persecution was objectively reasonable.[3] Citing State Department reports on Indonesia from 1999 and 2000, the BIA determined that "despite evidence that some anti-Chinese discrimination exists in Indonesia, and that there is continuing conflict between Muslims and Christians in certain regions, the government of Indonesia has nevertheless shown its general commitment to freedom of religion and its lack of institutional discrimination against the ethnic Chinese minority." The BIA then concluded that Lolong had not established that the Indonesian government was unable or unwilling to control the perpetrators of ethnic and religious violence.

[10] The BIA's denial of Lolong's asylum claim is consistent with governing law. We have consistently held that a general, undifferentiated claim of the type brought by Lolong

---

[3]The Dissent contends that the BIA applied the incorrect standard of proof in reaching this conclusion, adopting the "more likely than not" standard that is used in withholding of removal cases and specifically rejected by the Supreme Court in the asylum context. Dissent at 5059-60 (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987)). This objection is misplaced. Although the BIA's language could have been better crafted, it clearly recognized the difference between the "well-founded fear" and "more likely than not" standards. After referring to the two standards in the alternative, the BIA expressly applied the former to Lolong's asylum claim and the latter to her withholding claim. In fact, in determining that Lolong's fear of persecution was not objectively reasonable because she had not demonstrated a "reasonable possibility that [she] would be persecuted if she must return to Indonesia," the BIA employed language drawn directly from the Court's decision in *Cardoza-Fonseca*. *See Cardoza-Fonseca*, 480 U.S. at 440 (noting that " 'it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a *reasonable possibility*' " (emphasis added) (quoting *INS v. Stevic*, 467 U.S. 407, 424-25 (1984))).

does not render an alien eligible for asylum. *See, e.g.*, *Rostomian v. INS*, 210 F.3d 1088, 1089 (9th Cir. 2000) (rejecting asylum claim based on general civil strife); *cf. Martinez-Romero v. INS*, 692 F.2d 595, 595-96 (9th Cir. 1982) (noting that granting asylum based on claims of generalized civil strife "would permit the whole population [of the asylum-seeker's country]" to remain in the United States "indefinitely" and holding that "[t]here must be some special circumstances present before relief can be granted"). Furthermore, we have required that petitioners alleging a pattern or practice of persecution by non-government actors also prove that the government is unable or unwilling to control those actors. *See, e.g.*, *Gomes v. Gonzales*, 429 F.3d 1264, 1267 (9th Cir. 2005) (rejecting a pattern and practice claim because the State Department's Country Reports on Human Rights noted that "the Bangladesh government did not countenance attacks against Christians and intervened in such attacks to the extent that it was able"); *Mansour v. Ashcroft*, 390 F.3d 667, 673 (9th Cir. 2004) (rejecting a pattern and practice claim by a Coptic Christian because the State Department Profile indicated that Egyptian government was not "unable or unwilling to control" anti-Christian terrorists).

**[11]** Notably, before the BIA, Lolong did not make any argument that she feared being individually targeted for persecution.[4] Instead, she relied entirely on fears common to ethnic Chinese Christian women generally: a "pattern of rapes" perpetrated upon Chinese women, "a historical pattern of rioting" leading to "ethnically based violence" against ethnic Chinese, discrimination against ethnic Chinese women by the courts and the police, and the government's inability or unwilling-

---

[4]Although Lolong provided evidence of violence directed at a friend and at members of her family, this evidence does not show—and she has not argued, either before us or before the BIA, that it shows—that she is more likely to be targeted for persecution or harassment than any other member of Indonesia's Chinese Christian community. Rather, it shows only the type of undifferentiated claim that we have held is insufficient for purposes of asylum.

ness to control the groups responsible for this violence. The Dissent argues we must remand this case because the BIA "failed to address" the pattern-or-practice claim on which Lolong's asylum petition was based and disregarded the evidence supporting that claim. Dissent at 5054-56. As noted above, however, the BIA did specifically address Lolong's pattern-and-practice claim and concluded that "the mere fact that some attacks on Chinese or on Christians continue to occur" did not render her fear of persecution objectively reasonable, particularly given that Lolong had not established that the government was unable or unwilling to control the groups responsible for the violence.

Moreover, the BIA's conclusions are supported by substantial evidence. The government does not contest—and the record confirms—that sporadic violence against ethnic Chinese Christians persisted in Indonesia at least until 2000. We too are well aware of the long history of ethnic and religious strife in Indonesia. *See Sael*, 386 F.3d at 925-27. However, the record supports the BIA's conclusion that Lolong has not shown that the Indonesian government is unable or unwilling to control the perpetrators of this violence. As the BIA noted, the State Department's Country Reports ("Country Reports") indicated that "the government of Indonesia has [ ] shown its general commitment to freedom of religion and its lack of institutional discrimination against the ethnic Chinese minority."[5] Beyond this general commitment, moreover, the record

---

[5]As the Dissent points out, we have held that Country Reports are insufficient to rebut evidence that the petitioner faces an *individualized* threat of persecution in her home country. *See* Dissent at 5056-59. Lolong's failure to allege that she faces an individualized threat distinguishes this case from our prior decisions. In each of the cases cited by the Dissent, the petitioner had presented some evidence that he or she faced a unique risk of persecution upon return that was distinct from the petitioner's mere membership in a disfavored group. *See Marcos v. Gonzales*, 410 F.3d 1112, 1120-21 (9th Cir. 2005) (holding that Country Reports could not be used to rebut petitioner's testimony that he received numerous death threats); *Lal v. INS*, 255 F.3d 998, 1010 (9th Cir. 2004) (holding that the Country

contains evidence suggesting that the government has taken concrete steps to suppress ethnic and religious violence and to encourage reconciliation between opposing groups. We therefore cannot conclude that "the evidence . . . *compels* the conclusion that the asylum decision was incorrect." *Kataria*, 232 F.3d at 1112 (emphasis added). *Cf. Gomes*, 429 F.3d at 1267 (rejecting pattern-and-practice claim where "Bangladesh government *did not countenance attacks* against Christians and *intervened* in such attacks *to the extent that it was able*" (emphasis added)).

**[12]** In sum, Lolong has provided no evidence that she has been, or is likely to be, specifically targeted for persecution by any individual or group in Indonesia. The fear she has of harassment, discrimination, and sporadic violence may be a fear shared by millions of ethnic Chinese Christians in Indonesia, and given the sporadic violence that has recurred in that country over the past decades, Lolong is understandably nervous about returning to Indonesia. As we noted above, this may make her fear subjectively genuine; this subjective fear alone, however, is insufficient to render her eligible for asylum absent an individualized risk of persecution or a pattern and practice of persecution. Lolong has provided nothing that suggests that her fears are distinct from those felt by all other ethnic Chinese Christians in Indonesia. Nor has she shown that all ethnic Chinese Christians in Indonesia have, based on the circumstances there, a well-founded fear of persecution.

---

Report did not address "the specific facts on the record that differentiate Mr. Lal's case from" other members of his ethnic group). Even in *Sael v. Ashcroft*, which dealt with Indonesia, the petitioner had presented some evidence of an individualized threat. 386 F.3d at 927-30. In light of that evidence, we simply held that the Country Reports were insufficient to support "the denial of asylum in Sael's case." *Id.* at 929. Where, as here, the petitioner does not allege an individualized risk of persecution but raises only a pattern-or-practice claim, it is entirely appropriate to rely on Country Reports in determining whether such a pattern or practice of persecution exists.

Although we are sympathetic to the plight of such peoples, we understand the BIA's decision to preclude a general grant of asylum to Indonesian Chinese Christians, and the record supports such a decision.[6]

### IV

The petition for review is DENIED.

---

THOMAS, Circuit Judge, with whom PREGERSON, FISHER, and PAEZ, Circuit Judges, join, concurring in part and dissenting in part:

I concur in Section II of the majority opinion, which over-rules *Molina-Camacho v. Ashcroft*, 393 F.3d 937 (9th Cir. 2004). I respectfully dissent, however, from the majority's outright denial of the petition for review on the merits. In this case, the immigration judge ("IJ") granted asylum, but the Board of Immigration Appeals ("BIA") reversed. In its reversal, the BIA made serious legal errors in its analysis and failed to fully address the claims made by the petitioner. Unlike the IJ, who relied on actual evidence, the BIA treated the aspirational goals of a government as a proxy for actual governmental control of those who would mercilessly persecute individuals based on their religion and national origin. Therefore, I would grant the petition and remand the case for fur-

---

[6]We do not read the BIA's decision as a determination that no ethnic Chinese or Christian in early 2000 could have an objectively reasonable fear of persecution. Rather, we understand the BIA's decision to require that asylum petitioners prove something more than their status as female members of Indonesia's Chinese Christian community. The BIA's position is well established in our precedents. *See Melkonian*, 320 F.3d 1061, 1069 (9th Cir. 2003) (noting that petitioner had shown both membership in disfavored group *and* an individualized threat of persecution); *Rostomian*, 210 F.3d at 1089; *Kotasz v. INS*, 31 F.3d 847, 853-54 (9th Cir. 1994).

ther consideration by the BIA pursuant to *INS v. Ventura*, 537 U.S. 12 (2002).

I

The analysis used by the BIA was incorrect as a matter of law and cannot be sustained. The BIA's analysis is legally flawed because it (1) failed to address a core element of the petitioner's claim; (2) based its decision on grounds that are insufficient as a matter of law and in conflict with controlling case precedent; and (3) used the wrong standard of proof for asylum petitions. Each of these independent reasons requires a remand to the BIA for it to re-examine the case using the correct legal standards. *See Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1058 (9th Cir. 2006) ("[W]here the BIA applies the wrong legal standard to an applicant's claim, the appropriate relief from this court is remand for reconsideration under the correct standard . . . .").

A

The BIA failed to address Lolong's primary claim that there was a pattern or practice of persecution against Chinese Christian women that the Indonesian government was either unable or unwilling to control. All the BIA opinion decides is that the Indonesian government, in the BIA's view, is willing to oppose discrimination and persecution of Christians and the ethnic Chinese, stating that the Indonesian government has "shown a general commitment to freedom of religion" and "a lack of institutional discrimination." The BIA never discusses the Indonesian government's ability to control the violence. Because there was substantial evidence of the government's inability to control the violence regardless of its intentions, and because the IJ so found, the BIA's reversal without explanation was error.

The BIA is obligated to consider and address in its entirety the evidence submitted by a petitioner. *Mejia v. Ashcroft*, 298

F.3d 873, 879-80 (9th Cir. 2002); *Kamalthas v. INS*, 251 F.3d 1279, 1283-84 (9th Cir. 2001). The BIA must "indicate with specificity that it heard and considered petitioner's claims." *Maravilla Maravilla v. Ashcroft*, 381 F.3d 855, 858 (9th Cir. 2004) (quoting *Arrozal v. INS*, 159 F.3d 429, 433 (9th Cir. 1998)). The BIA commits reversible error when it "merely repeat[s] petitioners' claims and summarily dismisse[s] them without even purporting to engage in any substantive analysis or articulating any reasons for its decision." *Rodriguez-Lariz v. INS*, 282 F.3d 1218, 1227 (9th Cir. 2002).

Here, the IJ's factual finding that the central Indonesian government has been unable to control the forces of persecution is amply supported by the voluminous record, but the BIA never addresses it. The record indicates that not only has the government been unable to control rogue forces in Indonesian society, but it has been unable to control its own military forces, which evidence suggests have carried out some of the grossest human rights abuses against Chinese and Christian minority groups.

Since the 1998 riots and the ouster of President Suharto, the record shows that religious violence by Muslim fundamentalists against the Christian population has actually increased, often with the aid of military elements uncontrolled by the central government.[1] Lolong presented substantial expert tes-

---

[1]For example, the record contains evidence that Indonesian Army units have been caught on tape "providing covering fire for Muslim gunmen attacking Christian neighborhoods." Ron Moreau, *An Island Holy War*, Newsweek, August 7, 2000. The civilian Defense Minister reported that "members of the Army have become a major cause of the clashes," and victimized Christians have reported seeing "military uniforms beneath the Jihad fighters' white robes." Ian Timberlake, *Indonesians see Suharto Behind Religious War; Survivors of Attack Blame Soldiers Loyal to ex-Leader*, USA Today, August 2, 2000. "Instead of protecting them as promised, the Indonesian government soldiers joined in the slaughter" of Christians, witnesses say. *Id.* Members of the United States Congress have gone so far as to demand that the United States not lend any military expertise to Indonesian "military officers who approve of the killing of innocent women and children." *See USDS Pitts Decries Indonesian Military's Role in Violence*, Asia Pulse, July 26, 2000.

timony on the issue, which the IJ credited and the BIA did not dispute. The expert testimony included an analysis of the current Indonesian regime, leading the expert to conclude that the present government could not control anti-Chinese and anti-Christian elements in Indonesia.

In short, the BIA did not address the pivotal point of Lolong's claim—that the Indonesian government, for all its good intentions, is unable to control anti-Chinese and anti-Christian elements. There was substantial evidence in the record that such was the case and the IJ so found. Given the abundance of record evidence on the matter, the BIA was not permitted to avoid the question by claiming there was an "absence of evidence" that the government was unable to control the violence. *See Ubau-Marenco v. INS*, 67 F.3d 750, 760 (9th Cir. 1995) ("the BIA must address the evidence presented, and state the reasons why . . . [it] is not sufficient") (internal quotation marks omitted), *overruled on other grounds in Fisher v. INS*, 79 F.3d 955, 963 (9th Cir. 1996); *Mejia-Carrillo v. INS*, 656 F.2d 520, 522 (9th Cir. 1981) (holding that the BIA must "give reasons which show that it has properly considered the facts which bear on its decision"). While the BIA was permitted to disagree with the IJ's finding —a decision we could have reviewed for substantial evidence —it was not permitted to ignore it altogether or reverse it without explanation.

This error was significant because if the BIA properly considered the evidence in full, I believe it should have concluded that the record amply supports the IJ's conclusion that Ms. Lolong was objectively reasonable in her fear that she cannot rely on the government to protect her. A remand is required so that the BIA can address Lolong's claim on the merits in the first instance.

B

The BIA's decision was also insufficient as a matter of law and contrary to controlling case precedent. It determined that

a Chinese or Christian could not reasonably fear persecution in Indonesia in early 2000 based on conclusions it drew from the State Department Country Reports. According to the BIA decision, the Reports show Indonesia's "general commitment to freedom of religion and its lack of institutional discrimination against the ethnic Chinese minority."

This rationale is insufficient as a matter of law. *See Marcos v. Gonzales*, 410 F.3d 1112, 1120-22 (9th Cir. 2005). In *Marcos*, we specifically rejected the sufficiency of a Country Report statement much akin to the one at bar, which stated that the government "generally respected" human rights. *Id.* at 1120 n.7. Rather, we reiterated our long-standing rule that the agency use an individualized analysis with respect to the effect of State Department Country Reports.[2] *Id.* at 1120-22. The BIA is not entitled to deny eligibility for asylum based on generalized conclusions in Country Reports. *Lal v. INS*, 255 F.3d 998, 1010 (9th Cir. 2001).

Further, the BIA's conclusion conflicts directly with *Sael v. Ashcroft*, 386 F.3d 922 (9th Cir. 2004), in which we considered the very Country Reports at issue in this case. We detailed the "voluminous record" which documented "a history of anti-Chinese violence dating back as far as 1740." *Id.* at 925. In addition to the 1998 riots in which more than 1,000 people were killed, we noted that "ethnic Chinese found their homes marked for destruction" in the years since the 1998 riots, and that "Chinese Christian churches and homes have . . . been attacked in a violent merger of religious and ethnic tensions." *Id.* at 925-26. We held that the very Country Reports at issue in this case buttressed the conclusion that

---

[2]In this context, it is also important to underscore that the BIA's analysis of country conditions did not come as part of "changed country conditions" examination, which occurs *after* a petitioner has established a prima facie case of a well-founded fear of persecution. It occurred as part of its initial examination of whether or not any reasonable person could fear persecution based on past events in the country.

"[g]overnment efforts to stop this cycle of scapegoating and violence have thus far been ineffective, perhaps because ethnic Chinese are still targets of official discrimination." *Id.* at 926. We noted that the 1999 Country Report " 'found evidence that some elements of the military may have been involved in provoking the violence, which included attacks against Sino-Indonesian women' during the 1998 riots." *Id.* at 927. We found it significant that the 1999 Country Report stated that government regulations prohibit Chinese schools, cultural groups, and trade associations. *Id.*

We were not alone in reaching this conclusion. Former Chief Judge Becker wrote for the Third Circuit that:

> In the late 1990s, Indonesia's Chinese Christian population became the target of widespread attacks perpetrated by Muslim Indonesians. The 1999 United States State Department country report for Indonesia noted that "[i]nterreligious violence and violence against ethnic minorities continued. Attacks against houses of worship continued, and the lack of an effective government response to punish perpetrators and prevent further attacks led to allegations of official complicity in some incidents." U.S. Dep't of State, 1999 Country Reports on Human Rights Practices — Indonesia, February 25, 2000. [abbr. omitted]. In May 1998, there were "serious and widespread attacks" on Chinese-owned businesses and homes by Muslim Indonesians, which led to the deaths of over one thousand people.

*Lie v. Ashcroft*, 396 F.3d 530, 532-33 (3d Cir. 2005). Thus, Judge Becker concluded that "1998 represented a period of significant violence and rioting against individuals of Chinese origin throughout Indonesia." *Id.* at 533.

In short, the BIA was not permitted to rely on Country Reports to rebut Ms. Lolong's specific evidence about her

family and her church and the general conclusions it drew from those Country Reports are precluded by case law.

C

The BIA applied the incorrect standard of proof in its analysis. The Supreme Court has explicitly held that a petitioner seeking asylum is not required to prove that it would be more likely than not that she would be persecuted upon return to the country. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987). Rather, under controlling precedent, a petitioner need only establish that there is a one in ten chance of persecution to show that the petitioner's fear is objectively reasonable and that they are thus eligible for asylum. *Njuguna v. Ashcroft*, 374 F.3d 765, 770 (9th Cir. 2004). The BIA applied the rejected "more likely than not" standard.[3]

The majority claims the BIA "clearly recognized" the difference between the two standards and applied them correctly, but a close look at the BIA's opinion suggests otherwise. First, when the BIA introduced the "more likely than not" standard, it cited the refugee definition applicable to an asylum claim, I.N.A. § 101(a)(42)(A), and not the withholding of removal statute, § 241. Second, in applying the facts to the law on the asylum claim, it reasoned that Lolong's fear was not well-founded because "the large majority of ethnic Chinese continue to reside in [Indonesia] without suffering physical attacks."[4] Yet if it was truly applying the correct one-in-

---

[3]The "more likely than not" standard applies to the question of whether a petitioner is entitled to withholding of removal. 8 C.F.R. § 1208.16(b)(2); *INS v. Stevic*, 467 U.S. 407, 429-30 (1984). Withholding of removal and asylum "are two distinct forms of relief." *Cardoza-Fonseca*, 480 U.S. at 429 n.6. "[O]ur case law quite clearly establishes that the legal difference between 'clear probability' and 'well-founded fear' must be respected." *Rebollo-Jovel v. INS*, 794 F.2d 441, 444 (9th Cir. 1986).

[4]We know this discussion was part of the BIA's asylum analysis because at the end of this discussion the opinion states "*[n]or* has the respondent established that . . . she would qualify for withholding of removal." (emphasis added).

ten standard, what happened to a "majority" of ethnic Chinese would be irrelevant. Indeed, that it considered the plight of the "majority," or 51 percent, suggests it was applying the more likely than not standard, which by definition looks to the 51 percent mark. Third, whether Lolong was eligible for withholding of removal was not properly before the BIA. The IJ granted asylum relief, did not reach the question of whether Lolong was entitled to withholding of removal, and the INS only appealed the asylum holding.

The majority writes off any confusion by stating that "the BIA's language could have been better crafted," *Maj. Op.* at 5049 n.3, but we have held that to avoid any confusion as to which standard the BIA is applying, "the BIA [is required] to make an *explicit* statement that it is applying a more generous standard to the asylum claim than to the petition for withholding of deportation." *Rodriguez v. INS*, 841 F.2d 865, 869 (9th Cir. 1987) (emphasis added). Not only is the BIA less than explicit about which standard it is applying, it never so much as mentions the proper one-in-ten standard.

The BIA's legal analysis is impermissible under *Cardoza-Fonseca*, and this error of law requires remand for the BIA's reconsideration "under the proper standard." *Martinez-Sanchez v. INS*, 794 F.2d 1396, 1399 (9th Cir. 1986).

## II

In sum, I concur in the majority's conclusion that *Molina-Camacho* should be overruled. However, I respectfully disagree with the majority as to the merits of Ms. Lolong's claim. The BIA's analysis on the merits was founded on an improper application of law in a number of respects. It failed to address Lolong's claims and the evidence supporting them, and reversed a core IJ finding without explanation. Its reasoning was insufficient as a matter of law and in conflict with controlling case precedent. It applied the incorrect standard of proof.

More disturbingly, the BIA rejected actual evidence in the record of the Indonesian government's inability or unwillingness to control persecution in favor of the stated aspirational goals of that government. Remand is required so that the BIA can conduct a proper examination of the evidence under proper legal standards.

No one doubts that Ms. Lolong has a well-founded subjective fear of future persecution if she is forced to return to Indonesia. No one doubts her good faith, nor her contribution to our country during the time she has spent here. The only question in this case is whether her fear is reasonable. The undeniable fact is that over a thousand Chinese Indonesians were killed, churches were burned, and Chinese-Christian women raped just prior to the time when Lolong asked for asylum. By any objective measure, her specific fear of persecution was reasonable, and the BIA should have considered it on the merits of the evidence, under proper legal standards.

For these reasons, I respectfully dissent.