NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

DEC 4 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

GIDEON ANDREAS,

      Petitioner,

  v.

MERRICK B. GARLAND, Attorney General,

      Respondent.

No. 23-2196

Agency No.
A205-751-161

MEMORANDUM[*]

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted November 7, 2024[**]
Pasadena, California

Before: CALLAHAN, WALLACH[***], and DE ALBA, Circuit Judges.
Partial Dissent by Judge DE ALBA.

    Petitioner Gideon Andreas, a native and citizen of Indonesia, petitions for

review of an order of the Board of Immigration Appeals ("BIA") that dismissed his

---

    [*]     This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

    [**]     The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

    [***]     The Honorable Evan J. Wallach, United States Circuit Judge for the Federal Circuit, sitting by designation.

appeal from an order of an immigration judge ("IJ") that denied his applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). We have jurisdiction pursuant to 8 U.S.C. § 1252, and we deny the petition.

"Where, as here, the BIA has reviewed the IJ's decision and incorporated portions of it as its own, we treat the incorporated parts of the IJ's decision as the BIA's." *Molina-Estrada v. I.N.S.*, 293 F.3d 1089, 1093 (9th Cir. 2002) (citations omitted). "We review the Board's legal conclusions de novo, and its factual findings for substantial evidence. A finding by the IJ is not supported by substantial evidence when 'any reasonable adjudicator would be compelled to conclude to the contrary' based on the evidence in the record." *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1059 (9th Cir. 2017) (en banc) (citations and quotation marks omitted); *see* 8 U.S.C. § 1252(b)(4)(B).

1.    For purposes of asylum and withholding of removal, an applicant bears the burden of establishing that the persecution was or would be "committed by the government, or by forces that the government was [or is] unable or unwilling to control." *Bringas-Rodriguez*, 850 F.3d at 1062 (citation and quotation marks omitted); *see Velasquez-Gaspar v. Barr*, 976 F.3d 1062, 1064-65 (9th Cir. 2020). Andreas claimed past persecution and a fear of future persecution on the ground that Muslim Indonesians have persecuted him and would persecute him

based on his Chinese ethnicity and Christian religion. The IJ found that Andreas failed to carry his burden of showing that the Indonesian government was or would be unable or unwilling to control such private persecution and the BIA concluded that the IJ's finding was not clearly erroneous.

a. Andreas argues that the Agency found that he did not carry his burden *because* he did not report additional incidents to the Indonesian authorities. To the extent Andreas argues that the Agency erroneously treated the lack of additional reports as dispositive, that argument is not supported by the record.

At the hearing, Andreas presented evidence that he, his family members and his friends were threatened or harmed by Muslim Indonesians on several occasions between 1989 and 2007. Andreas reported one of the incidents to the police. On April 17, 1996, when Andreas was 17 years old, a group of Muslim students confronted Andreas and a friend and demanded money, using racial slurs and brandishing a "cutter knife." Because Andreas did not have any money with him, the Muslim students demanded that he bring money the following day. The next day, Andreas and his father reported the incident to the police, but the police "didn't take [them] seriously" and told them "just to compromise with [the Muslim students] because they didn't do anything to [Andreas] and there's no proof that they carry the cutter knife." The day after that, the Muslim students again confronted Andreas, took his money, and slammed him against "the gates of the

school," breaking his tooth and causing his lip to bleed. Andreas did not report that incident or a subsequent incident in 2003 when some of the same individuals again attacked Andreas and a friend, hitting Andreas on the head and causing him to bleed.

In considering whether an applicant has made the "unable or unwilling" showing, an applicant's "failure to report to authorities" is not "outcome determinative"; "[w]hether a victim has reported or attempted to report violence or abuse to the authorities is a factor that may be considered, as is credible testimony or documentary evidence explaining why a victim did not report." *Bringas-Rodriguez*, 850 F.3d at 1069 (citations omitted). In short, an applicant claiming persecution by private parties "need not have reported that persecution to the authorities if he can convincingly establish that doing so would have been futile or have subjected him to further abuse." *Id.* at 1065 (citation and quotation marks omitted).

Here, the Agency did not treat the lack of additional police reports as dispositive. Instead, both the IJ and the BIA, citing *Bringas-Rodriguez*, properly recognized that an applicant "is not required to have reported non-governmental persecution to government authorities if he can convincingly establish that doing so would have been futile or would have subjected him to further abuse." The IJ also considered the police's response to Andreas's initial report, reasons Andreas

gave for not making subsequent reports, and other country conditions evidence. Applying the governing legal standards, the IJ found that Andreas had not convincingly established that further reporting would have been futile and that he had not otherwise established that the Indonesian government was or would be unable or unwilling to protect him from private persecution.

b. Andreas also argues that the Agency's finding that he failed to satisfy the "unable or unwilling" prong is not supported by substantial evidence. We disagree.

First, Andreas contends that the Agency failed to give proper weight to his testimony regarding the police's response to his report in 1996. The IJ's interpretation of this evidence—that "the absence of injuries . . . . may have led the police, at least in some measure, to indicate that they could do nothing about the situation"—was not unreasonable. Although Andreas testified to his belief that further reporting would have been futile, that does not necessarily compel a finding that reporting in fact would have been futile. *See Castro-Perez v. Gonzales*, 409 F.3d 1069, 1071-72 (9th Cir. 2005).

Second, Andreas argues that the Agency failed to properly weight the country conditions evidence of discrimination and violence against Chinese and Christian Indonesians. In particular, Andreas cites the riots in May 1998 against Chinese Indonesians; rallies and riots in 2016 and 2017 in response to perceived

blasphemy against the Islam religion by the ethnically Chinese former governor of Jakarta and by a Buddhist woman, both of whom were ultimately convicted and sentenced for blasphemy; a series of terrorist attacks between 2016 and 2018, including on churches, such as the May 2018 ISIS-claimed suicide bombings of three churches in Andreas's hometown of Surabaya; and anti-Chinese rioting in 2019 following the presidential election.

The IJ acknowledged that there have been "widespread instances of harassment and discrimination relating to mistreatment of ethnic Chinese Indonesians and Christian Indonesians, sometimes rising to the level of persecution." However, the IJ found that the Indonesian government also "has taken some measures to protect ethnic and religious minorities." The IJ noted that police and prosecutors "had used the provisions of a newly revised anti-terrorism law to arrest members of organizations supporting violence against individuals with differing religious beliefs" and that the police have "also provided special protection to some churches in major cities during Sunday services and on holidays."

The record contains additional evidence that the Indonesian government responded to the events cited by Andreas. For example, Andreas testified that his hometown of Surabaya was well-guarded by the army during the May 1998 riots; a number of rioters who targeted Buddhist temples in response to the Buddhist

woman's alleged blasphemy were arrested and sentenced; and the government deployed 50,000 police and soldiers and arrested hundreds of individuals during the demonstrations following the 2019 presidential election.

In light of this evidence, the record does not compel a finding that further reporting would have been futile or that the Indonesian government otherwise was or would be unable or unwilling to protect Andreas from private persecution. *See Lolong v. Gonzales*, 484 F.3d 1173, 1179-81 (9th Cir. 2007) (en banc) (record did not compel finding that Indonesian government was unable or unwilling to control private persecution, notwithstanding the history of "sporadic violence against ethnic Chinese Christians," as well as the facts that "some anti-Chinese discrimination exists in Indonesia, and that there is continuing conflict between Muslims and Christians in certain regions," in light of evidence "suggesting that the government has taken concrete steps to suppress ethnic and religious violence and to encourage reconciliation between opposing groups"); *see also Velasquez-Gaspar*, 976 F.3d at 1064-65.

2.    Similarly, for purposes of CAT protection, the record does not compel a finding that it is more likely than not that Andreas would be tortured by or with the acquiescence of the Indonesian government.  Andreas contends that the Indonesian government would be acquiescent to future torture, but he does not appear to challenge the Agency's finding that he failed to establish a likelihood

that he would be subject to torture.  That finding is supported by substantial evidence.  While certain individuals did physically attack Andreas in both 1996 and 2003, Andreas did not testify that they likely would attack him again.  Additionally, Andreas visited Indonesia between 2003 and 2009, and his mother and sister have continued to live and attend church in Surabaya without incident since 2007.  *See Wakkary v. Holder*, 558 F.3d 1049, 1068 (9th Cir. 2009).

**PETITION DENIED.**

*Andreas v. Garland*, No. 23-2196

DE ALBA, Circuit Judge, dissenting in part:

I agree that Mr. Andreas's petition should be denied as to his CAT claim. But I cannot agree that the Agency's denial of asylum and withholding warrants deference in this case. *See Li v. Ashcroft*, 356 F.3d 1153, 1158 (9th Cir. 2004) (en banc) (noting the limitations of the substantial evidence standard); *see also Parada v. Sessions*, 902 F.3d 901, 909 (9th Cir. 2018) (same). I respectfully dissent.

The record compels the conclusion that the Agency inappropriately treated Mr. Andreas's lack of reporting as dispositive. Indeed, the *only* element of asylum that the Agency held Mr. Andreas did not meet was the "unable or unwilling" prong. It expressly found that all other elements were met, including that Mr. Andreas warranted a favorable exercise of discretion. In its ruling, the Agency expressly faulted Mr. Andreas for not returning to the police after they ignored his report in April 1996. Critically, as both the majority and BIA acknowledged, the police dismissed Mr. Andreas's 1996 report because his attackers had not attacked him yet—or as the BIA put it, because Mr. Andreas was not yet physically injured, he had not met their "threshold for becoming involved." Official unwillingness to get involved *unless and until* Mr. Andreas suffers physical violence because of his Chinese ethnicity or Christian faith is inherently official unwillingness to control persecution. This, coupled with country conditions reports of "widespread

harassment" of ethnic Chinese and Christian Indonesians, sufficiently demonstrates the futility of reporting and government ineffectiveness. *See Bringas-Rodriguez*, 850 F.3d 1051, 1069 (9th Cir. 2017) (en banc).

As for the Indonesian government's official actions, the record compels the conclusion that its responses to general violence and terrorism do not "equate to government ability and willingness" to protect Mr. Andreas from racial or religious persecution that the record shows is "long ingrained" in the country's culture. *J.R. v. Barr*, 975 F.3d 778, 782 (9th Cir. 2020); *Bringas-Rodriguez*, 850 F.3d at 1072. Relying on the general anti-terrorism law fails to account for the "actual country conditions" and "practices within state or municipal jurisdictions," which the Agency itself repeatedly acknowledges includes "widespread harassment and discrimination" against ethnically Chinese and Christian Indonesians that the government "continues to struggle" to address. *See Bringas-Rodriguez*, 850 F.3d at 1072.

I would grant Mr. Andreas's petition as to asylum given the record evidence and binding precedent that, in my view, compel reversal of the Agency's decision in this case.