**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| WINSTON IVAN GUTIERREZ-ALM, | No. 17-71012 |
| *Petitioner,* | Agency No. A070-031-172 |
| v. | |
| MERRICK B. GARLAND, Attorney General, | OPINION |
| *Respondent.* | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted December 13, 2022
Pasadena, California

Filed March 15, 2023

Before: Kenneth K. Lee and Holly A. Thomas, Circuit
Judges, and Richard D. Bennett,[*] District Judge.

Opinion by Judge Bennett

---

[*] The Honorable Richard D. Bennett, United States District Judge for the District of Maryland, sitting by designation.

# SUMMARY[**]

## Immigration

Denying Winston Gutierrez-Alm's petition for review of a decision of the Board of Immigration Appeals, the panel held that: 1) an Order to Show Cause ("OSC") that fails to disclose the time and place of an immigrant's deportation proceedings is sufficient to trigger the stop-time rule in a transitional rules case; 2) Gutierrez's OSC triggered the stop-time rule, making him ineligible for suspension of deportation; and 3) substantial evidence supported the denial of withholding of removal and protection under the Convention Against Torture ("CAT").

In 1989, Gutierrez entered the United States without inspection. In 1993, he was served an OSC, the charging document that initiated immigration proceedings prior to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). Gutierrez's OSC did not list the time and place of his proceedings. Gutierrez sought suspension of deportation, a form of relief available prior to IIRIRA. As relevant here, an applicant for suspension of deportation was required to accrue at least seven years of continuous physical presence in the United States prior to applying. However, IIRIRA provided that continuous physical presence is deemed to end when the applicant is served with a notice to appear ("NTA"). Under IIRIRA's transitional rules, which apply to individuals, like Gutierrez, whose proceedings were pending when IIRIRA was enacted,

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

this stop-time rule applies retroactively to proceedings initiated by an OSC. Accordingly, Gutierrez's continuous physical presence was deemed to end when he was served his OSC—only four years after his arrival, and thus short of the required seven years.

Gutierrez contended that the Supreme Court's decision in *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), instructs that his OSC was statutorily defective and that the stop-time rule was therefore inapplicable. In *Pereira*, the Supreme Court held that a putative NTA that fails to designate the time or place of removal proceedings does not trigger the stop-time rule. The panel wrote that the issue of whether *Pereira* applies to an OSC was an open issue, but it was not a close one: Every circuit to address the question has held that *Pereira* does not apply.

In joining those circuits and holding that an OSC that fails to disclose the time and place of proceedings is sufficient to trigger the stop-time rule in a transitional rules case, the panel explained that *Pereira* turned on the statutory definition of an NTA under 8 U.S.C. § 1229(a), which unambiguously requires an NTA to disclose the time and place of proceedings. The central reasoning in *Pereira* was that a document must meet all of the requirements set forth by § 1229(a) to trigger the stop-time rule. Comparatively, the pre-IIRIRA provision defining an OSC instructed officials to provide written notice of the time and place of deportation proceedings "in the order to show cause or otherwise." 8 U.S.C. § 1252b(a)(2)(A) (1994). The panel explained that the inclusion of the phrase "or otherwise" indicates that an OSC was not required to include the time and place information. Therefore, the panel concluded that *Pereira*'s logic, which rests on the "clear and unambiguous" mandate that a NTA include time-and-place information, is

inapplicable to an OSC, which contains no such requirement. As applied to Gutierrez, the panel concluded that he was ineligible for suspension of deportation because his physical presence was deemed to end with the service of his OSC.

Next, the panel concluded that substantial evidence supported the denial of withholding of removal. First, Gutierrez claimed that he would face persecution in Nicaragua due to his father's opposition to the Sandinista government. The panel concluded that substantial evidence supported the BIA's findings, as Gutierrez offered no credible, direct, and specific evidence that he would be perceived as an enemy of the Ortega regime and be persecuted on account of an imputed political opinion. The panel also observed that Gutierrez and his family had not faced persecution on account of his father's actions.

Second, Gutierrez claimed that he would be persecuted on account of membership in one of four putative particular social groups. With respect to his first two social groups— (1) persons fearing gang recruitment; and (2) individuals deported from the United States—the panel concluded that Gutierrez made no arguments related to those proposed social groups and therefore had waived those claims.

The panel concluded that Gutierrez's third proposed social group, "family members of people who opposed the government in the 1980s," was coextensive with his imputed political opinion claim and failed for the same reason: the record did not compel the conclusion that Gutierrez would be targeted for persecution based on his father's opposition to the Sandinista government. As to his fourth proposed social group, "persons who the authorities would suspect as being a gang member," the panel concluded that it failed for

lack of social distinction. The panel explained that, although this Court has recognized that persons who are incorrectly perceived to be gang members may constitute a cognizable social group, the applicant bears the burden to demonstrate that the proposed country of removal recognizes the group in question. Here, Gutierrez offered nothing beyond his own speculation to suggest that Nicaragua views "those perceived as gang members" as a distinct identity.

Finally, the panel concluded that substantial evidence supported the denial of CAT relief. The panel concluded that Gutierrez's contentions were entirely speculative and unsupported by the record, noting that, although the Sandinista regime has taken action against political dissidents, Gutierrez offered no evidence he will be perceived as such an adversary or targeted for torture. Moreover, the panel observed that Gutierrez left Nicaragua over twenty-five years ago, his family was able to reside in the country without issue following his father's departure in 1988, and his brother was not tortured upon his return in 2007.

## COUNSEL

Alejandro Garcia (argued), Law Offices of Alejandro Garcia, Commerce, California, for Petitioner.

Leslie McKay (argued) and Keith I. McManus, Assistant Directors, Office of Immigration Litigation; Maarja Luhtaru and John Beadle Holt, Trial Attorneys; Joseph H. Hunt, Assistant Attorney General, Civil Division; Office of Immigration Litigation, United States Department of Justice; Washington, D.C.; for Respondent.

# OPINION

BENNETT, District Judge:

Petitioner Winston Gutierrez-Alm ("Gutierrez" or "Petitioner") is a native and citizen of Nicaragua who entered the United States in 1989, one year after his father fled the country following his incarceration for taking up arms against the Sandinista regime. The government served Gutierrez an Order to Show Cause ("OSC") in 1993, and he has remained entangled in deportation proceedings for thirty years. He now seeks review of a decision of the Board of Immigration Appeals ("BIA") upholding a ruling of an Immigration Judge ("IJ"), who denied his application for suspension of deportation under pre-1996 immigration law and rejected his application for withholding of removal and relief under the Convention Against Torture ("CAT").[1]

This petition arrives in a unique procedural posture. The government initiated deportation proceedings against Gutierrez in 1993, under the statutory scheme that preceded the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546 (1996). Among other changes, IIRIRA implemented the "stop-time rule," which provides that an immigrant ceases to accrue physical presence in the United States upon service of the charging document in an

---

[1] United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85. The Convention was codified by the Section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105–227, 112 Stat. 2681–822. Its protections are implemented primarily through regulations. *See, e.g.*, 28 C.F.R. § 200.1; 8 C.F.R. §§ 1208.16–1208.18.

immigration case. 8 U.S.C. § 1229b(d)(1). The transitional rules that accompany IIRIRA require us to grant the stop-time rule retroactive effect over immigration proceedings that were pending at the time IIRIRA was adopted. Accordingly, the stop-time rule applies to Gutierrez's petition.

This case presents an issue of first impression: Does an Order to Show Cause that fails to disclose the time and place of an immigrant's deportation proceedings trigger the stop-time rule? Gutierrez contends that the Supreme Court's decision in *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), instructs that such an order would not trigger the stop-time rule, rendering him eligible for suspension of deportation. For the reasons that follow, we hold that *Pereira* is inapplicable, and that an Order to Show Cause lacking the time and place of an immigrant's deportation hearing is sufficient to trigger the stop-time rule in a transitional rules case. Accordingly, we hold that Gutierrez is ineligible for suspension of deportation. We further hold that substantial evidence supports the BIA's denial of his application for withholding of removal and CAT protection.

## BACKGROUND

Petitioner Winston Gutierrez-Alm is a native and citizen of Nicaragua, who entered the United States without inspection on March 25, 1989. At the time he entered the United States, Gutierrez was about eight years old. Accompanied by his mother and his three brothers, he travelled to join his father, who had fled to the United States one year prior. He was served an Order to Show Cause

("OSC")[2] in 1993 and has remained entangled in immigration proceedings ever since.

## I.   Initial Deportation Proceedings

On August 3, 1993, Gutierrez was detained by officers of the Immigration and Naturalization Service ("INS") and served an Order to Show Cause, charging him with deportability as an alien who entered without inspection, in violation of former Section 241(a)(1)(B) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1251(a)(1)(B) (1993). This OSC did not disclose the time and place of Gutierrez' deportation hearing; it provided only that a deportation hearing was "to be calendared," and that notice was to be provided by an Immigration Judge.

Three years elapsed before the government scheduled a deportation hearing. By March 1996, Gutierrez had been living in the United States for a continuous period of seven years, as required to apply for suspension of deportation. On May 16, 1996, the INS filed his OSC with the Immigration Court. That same day, the Immigration Court mailed Gutierrez a Notice of Hearing ("NOH"), advising him that a hearing had been scheduled before an IJ on September 6, 1996. At this initial hearing, Gutierrez admitted the factual allegations set forth in the OSC and conceded the charge of deportability, but expressed his intention to apply for suspension of deportation, asylum, withholding of removal, and relief under the Convention Against Torture. Accordingly, the IJ postponed proceedings to the following year.

---

[2] As noted throughout, an OSC was the charging document in immigration proceedings prior to the enactment of IIRIRA. *See Ram v. INS*, 243 F.3d 510, 512–13 (9th Cir. 2001).

Immigration law went through two substantial changes while Gutierrez' proceedings remained pending. First, on September 30, 1996, Congress enacted IIRIRA, which instituted sweeping changes to the immigration laws, and generally "made it harder for aliens to adjust their immigration status." *Rivera Vega v. Garland*, 39 F.4th 1146, 1150 (9th Cir. 2022). Subsequently, in 1997, Congress passed the Nicaraguan Adjustment and Central American Relief Act ("NACARA"), Pub. L. No. 105-100, 111 Stat. 2160, 2193 (1997). Enacted to ameliorate the effects of IIRIRA for "Central Americans . . . who came to the United States because their lives and families had been torn apart by war and oppression," NACARA authorized certain Nicaraguan immigrants who had entered the United States prior to 1995 to apply for lawful permanent resident status. *Hernandez-Mezquita v. Ashcroft*, 293 F.3d 1161, 1164 (9th Cir. 2002) (quoting 143 Cong. Rec. S12258-01, S12261 (daily ed. Nov. 9, 1997)).

Accordingly, on November 10, 1998, Gutierrez informed the IJ that he intended to seek adjustment of status pursuant to NACARA. The IJ found that Gutierrez was prima facie eligible for relief, and administratively closed his deportation proceedings with the consent of all parties. Gutierrez submitted his NACARA application on April 28, 2000, but was deemed inadmissible due to his criminal record. However, his proceedings remained closed for seven years.

## II. Application for Suspension and Withholding of Deportation

The Department of Homeland Security reinstated deportation proceedings against Gutierrez in January 2007.[3] Following five years of intermittent proceedings, Gutierrez applied for asylum, withholding of deportation, and CAT relief on June 26, 2012. At a hearing before another IJ, Gutierrez and his father, Julio Rafael Gutierrez ("Julio"), testified in support of his application.

Julio testified that he immigrated to the United States on June 15, 1988, to seek asylum after fleeing political persecution in Nicaragua. At the time, the Nicaraguan government had been controlled by the Sandinista party. In 1987, the Sandinista government arrested Julio for possession of weapons and explosives and incarcerated him from November 1987 to February 1988. Julio testified that the government prosecuted him for taking up arms with the "Partido Liberal Independiente," or "Independent Liberal Party," which had engaged in armed conflict against the Sandinista regime in the late 1980s. The government beat Julio in custody and forced him to serve the Sandinista military after his release, prompting him to desert and flee to the United States three months later. In the months after he fled, Julio feared for his family's safety, as he was concerned that the Nicaraguan government would retaliate against them

---

[3] It appears that Gutierrez was in government custody when the Government moved to reopen his application. During the nine-year period in which his proceedings were administratively closed, Gutierrez was arrested and convicted of several offenses, including use of controlled substances, manufacture and possession of a dangerous weapon, carrying a concealed dirk or dagger, burglary, theft, and driving with a suspended license.

for his political opposition. However, he acknowledged that his wife and children had been able to remain in Nicaragua without issue for eight months following his departure.

Testifying on his own behalf, Gutierrez explained that he had entered the United States with his family in 1989, one year after his father fled Nicaragua. He acknowledged that he had never been involved in "any kind of political party either here or in Nicaragua," and that he was unaware of whether the Sandinista party had returned to power in Nicaragua. However, he claimed that he did not wish to return to Nicaragua because he was unfamiliar with the country's culture and concerned about its poor economic conditions. Gutierrez recounted that Julio was afraid that Gutierrez would be targeted because of Julio's actions. Additionally, he indicated that his brother Norvin, a gang member, had been incarcerated in Nicaragua for three weeks following his deportation from the United States, and has since been followed by police. Gutierrez expressed concern he would be viewed as a gang member because of his relationship with Norvin and imprisoned immediately upon his arrival. He also insisted that he could not leave his wife and children behind in the United States.

### III. Decisions of the Immigration Judge and the Board of Immigration Appeals

On August 14, 2012, the Immigration Judge denied Petitioner's application for relief. First, the IJ denied Gutierrez's application for suspension of deportation, concluding that the stop-time rule paused his accrual of continuous physical presence on August 3, 1993, the date he was served with an Order to Show Cause under the pre-IIRIRA immigration laws. *See* INA § 240A(d)(1), 8 U.S.C. § 1229b(d)(1); *In re Nolasco-Tofino*, 22 I. & N. Dec. 632

(BIA 1999). Second, the IJ determined that Gutierrez's asylum application was untimely, as he had failed to file it within one year of his arrival in the United States. Third, the IJ concluded that Gutierrez could not demonstrate a reasonable fear of persecution on a protected ground and that his fear of torture was speculative. In rejecting these claims, the IJ observed that Gutierrez's family had been able to reside in Nicaragua without incident for eight months after his father fled the country, and that the Nicaraguan government had enacted a law granting amnesty to individuals who took up arms against the government prior to 1994. Additionally, although his brother Norvin had been imprisoned following his deportation, this was attributable to his criminal offenses and his membership in a criminal gang—not to the political activities of his father.

Gutierrez appealed, and the Board of Immigration Appeals dismissed his appeal on March 12, 2014. The BIA affirmed the IJ's finding that the service of the OSC on Gutierrez paused the accrual of physical presence and precluded his application for suspension of deportation. The BIA specifically reasoned that an OSC is not required to include the time and place of deportation proceedings, unlike a Notice to Appear ("NTA"), the charging document under current immigration law. The BIA also concluded that Gutierrez's proposed particular social groups were not cognizable, and that he failed to establish a likelihood of future persecution or torture by the Nicaraguan government.

On April 7, 2014, Gutierrez petitioned this Court for review of the BIA's denial of his application. Shortly thereafter, the Government filed a motion to remand in light of intervening case law that adjusted the definition of the "particular social group" protected ground. *See generally Pirir-Boc v. Holder*, 750 F.3d 1077 (9th Cir. 2014); *In re M-*

*E-V-G-*, 26 I. & N. Dec. 227 (BIA 2014); *In re W-G-R-*, 26 I. & N. Dec. 208 (BIA 2014). We granted this motion and remanded to the BIA, which subsequently remanded to the IJ. However, Gutierrez presented no new witnesses or evidence in support of his application, and the IJ again denied all forms of relief.[4]

Gutierrez once again appealed to the BIA. On March 15, 2017, the BIA dismissed his appeal without addressing his arguments regarding suspension of deportation. In so ruling, the BIA found that three of Gutierrez's claimed particular social groups—"individuals deported from the United States," "persons fearing gang recruitment," and "persons who the authorities would suspect as being a gang member"—were not legally cognizable. Addressing his political persecution claim and his proposed social group of "family members of people who opposed the government in the 1980s," the BIA concluded that Gutierrez failed to establish an objectively reasonable fear of persecution in Nicaragua on either ground. Consequently, the BIA upheld the IJ's conclusion that it was unlikely Gutierrez would be persecuted based on his relationship to his father.

This petition followed.

## STANDARD OF REVIEW

This Court reviews the factual findings of the Board of Immigration Appeals for substantial evidence. 8 U.S.C. § 1252(b)(4)(B). Substantial evidence exists when the BIA's conclusions "are 'supported by reasonable, substantial, and probative evidence in the record.'" *Dawson v. Garland*, 998 F.3d 876, 882 (9th Cir. 2021) (quoting *Melkonian v.*

---

[4] The IJ incorporated his August 14, 2012, decision by reference.

*Ashcroft*, 320 F.3d 1061, 1065 (9th Cir. 2003)). "This strict standard bars the reviewing court from independently weighing the evidence and holding that the petitioner is eligible for asylum, except in cases where compelling evidence is shown." *Kotasz v. INS*, 31 F.3d 847, 851 (9th Cir. 1994); *see also Guo v. Sessions*, 897 F.3d 1208, 1212 (9th Cir. 2018). Accordingly, the agency's factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Zehatye v. Gonzales*, 453 F.3d 1182, 1185 (9th Cir. 2006) (quoting 8 U.S.C. § 1252(b)(4)(B)); *see also Silva-Pereira v. Lynch*, 827 F.3d 1176, 1185 (9th Cir. 2016) ("[I]n order to reverse the BIA, 'we must determine that the evidence not only *supports* a contrary conclusion, but *compels* it—and also compels the further conclusion that the petitioner meets the requisite standard for obtaining relief.'" (emphasis in original) (quoting *Huang v. Holder*, 744 F.3d 1149, 1152 (9th Cir. 2014))). Issues of law, mixed questions of law and fact, and constitutional issues are reviewed *de novo*. *Zhi v. Holder*, 751 F.3d 1088, 1091 (9th Cir. 2014); *Vargas-Hernandez v. Gonzales*, 497 F.3d 919, 921 (9th Cir. 2007).

## ANALYSIS

### I.  Suspension of Deportation

First, Gutierrez argues that he is eligible for suspension of deportation under the pre-1996 Immigration and Nationality Act. Suspension of deportation, the predecessor of cancellation of removal, was a form of relief available prior to IIRIRA, which consolidated deportation and exclusion proceedings into a single statutory pipeline. *See Romero-Torres v. Ashcroft*, 327 F.3d 887, 889 (9th Cir. 2003). "In IIRIRA, Congress created proceedings—with different names and slightly different requirements—that

paralleled the pre-IIRIRA deportation scheme." *Ram*, 243 F.3d at 513. "Before IIRIRA, aliens were placed in deportation proceedings after being served with an OSC, and could seek relief by applying for 'suspension of deportation.' After IIRIRA, aliens are placed in removal proceedings after being served with a notice to appear, and can seek relief by applying for 'cancellation of removal.'" *Mendiola-Sanchez v. Ashcroft*, 381 F.3d 937, 939 (9th Cir. 2004) (quoting *Ram*, 243 F.3d at 513); *see also Campos-Hernandez v. Sessions*, 889 F.3d 564, 567 n.3 (9th Cir. 2018) ("IIRIRA . . . changed the terms previously used in immigration statutes, replacing 'deportation' with 'removal' . . . .").

Gutierrez's case arrives in an unusual procedural posture. "When Congress enacted IIRIRA, it included in the statute a set of 'transitional rules' specifying that particular provisions of the permanent statute should apply to petitioners against whom the INS had already initiated proceedings before the statute's effective date." *Garcia-Ramirez v. Gonzales*, 423 F.3d 935, 940 (9th Cir. 2005); *accord Mendiola-Sanchez*, 381 F.3d at 939 ("Congress enacted transitional rules that instruct us to apply the pre-IIRIRA rules to cases that were pending when IIRIRA was enacted subject to limited exceptions."); IIRIRA § 309(c)(1), Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996) (transitional rules). Gutierrez entered the United States in 1989 and was served with an OSC in 1993. Congress enacted IIRIRA in 1996, after his proceedings were initiated but before they were administratively closed. As Gutierrez's proceedings were pending when IIRIRA was enacted, the transitional rules govern this case.

"The transitional rules that apply to these petitions instruct us to apply the law of suspension of deportation as it existed in 1996." *Mendiola-Sanchez*, 381 F.3d at 939 &

n.3 (citing 8 U.S.C. § 1229b(d)). Prior to IIRIRA, an immigrant was eligible for suspension of deportation if:

> (1) he or she had been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of the application for suspension of deportation; (2) he or she was a person of good moral character; and (3) deportation would result in extreme hardship to the alien or to an immediate family member who was a United States citizen or a lawful permanent resident.

*Ram*, 243 F.3d at 513 (cleaned up) (quoting 8 U.S.C. § 1254(a)(1) (1994)). Gutierrez sought suspension of deportation under this provision in his 2012 application, as he has resided in the United States for more than thirty years.

However, IIRIRA and the transitional rules that accompany it adjust the framework for this analysis. IIRIRA changed the calculation of physical presence by providing that an immigrant's continuous physical presence is "deemed to end . . . when the [immigrant] is served with a notice to appear." 8 U.S.C. § 1229b(d)(1). The transitional rules mandate that this "stop-time rule" has retroactive effect over deportation proceedings initiated by an OSC that was issued prior to the enactment of IIRIRA. *Ram*, 243 F.3d at 516; *accord Garcia-Ramirez*, 423 F.3d at 939–41 (observing that the transitional rules "contain unambiguous congressional intent that the Act's stop-time and 90/180-day rules apply retroactively"). Accordingly, in a transitional rules case, an immigrant's continuous physical presence in the United States is deemed to have ended when the

immigrant was served with an OSC under the pre-IIRIRA deportation scheme. The stop-time rule presents a problem for Gutierrez, who entered the United States in 1989 and received an OSC in 1993—only four years later.

At issue in this case is whether an Order to Show Cause that does not disclose the time and place of an immigrant's deportation proceedings is sufficient to trigger the stop-time rule. Gutierrez's OSC did not list the time and place of his deportation proceedings, providing only that a hearing was "to be calendared" with "notice to be provided" by an Immigration Judge. The government did not provide Gutierrez with information regarding the time and place of his hearing until it sent him an NOH in May 1996—about two months after he would have accrued the seven years of continuous physical presence necessary to be eligible for suspension of deportation under the statutory framework that preceded IIRIRA. Gutierrez contends that the Supreme Court's decision in *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), instructs that his OSC is statutorily defective and that the stop-time rule is therefore inapplicable.

In *Pereira*, the Supreme Court considered whether a Notice to Appear ("NTA") that does not list the time and place of removal proceedings triggers the stop-time rule. 138 S. Ct. at 2113. The Court characterized this issue as a "narrow question" that "lies at the intersection of [two] statutory provisions," and it predicated its analysis on the "clear and unambiguous" language of IIRIRA. *Id.* at 2110, 2113. The plain language of 8 U.S.C. § 1229b(d)(1)(A) provides that the stop-time rule requires service of "a notice to appear under section 1229(a)." *Id.* at 2109–10 (quoting 8 U.S.C. § 1229b(d)(1)(A)). That provision defines an NTA as a "'written notice . . . specifying' several required pieces of information, including '[t]he time and place at which the

[removal] proceedings will be held.'" *Id.* (alterations in original) (quoting 8 U.S.C. § 1229(a)(1)(G)(i)). Accordingly, the Supreme Court held that "[a] putative notice to appear that fails to designate the specific time or place of the noncitizen's removal proceedings is not a 'notice to appear under section 1229(a),' and so does not trigger the stop-time rule." *Id.* at 2113–14; *see also Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1482 (2021) (holding that an NTA must consist of "a single document" containing all requisite information).

This Court has not issued a binding opinion on the issue of whether *Pereira* applies to an Order to Show Cause. While this is an open issue, it is not a close one: Every circuit to address this question has held that *Pereira* does not apply to an OSC, a charging document issued before IIRIRA under a separate statutory framework with distinct requirements. *See, e.g.*, *Jiang v. Garland*, 18 F.4th 730, 734–35 (2d Cir. 2021) (per curiam); *Maradia v. Garland*, 18 F.4th 458, 462–63 (5th Cir. 2021); *Perez-Perez v. Wilkinson*, 988 F.3d 371, 375 (7th Cir. 2021); *see also United States v. Escobar*, 970 F.3d 1022, 1026–27 (8th Cir. 2020); *Bilek v. Att'y General*, 793 F. App'x 929, 933 n.1 (11th Cir. 2019). We now hold the same.

This result flows directly from the text and structure of the pre-IIRIRA immigration laws. *Pereira* turned on the statutory definition of a Notice to Appear. Its central reasoning was that a document must meet all of the requirements set forth by 8 U.S.C. § 1229(a) to trigger the stop-time rule. *Pereira*, 138 S. Ct. at 2109–10. That provision unambiguously requires an NTA to disclose the time and place of an immigrant's removal proceedings. *Id.* at 2110; *see* 8 U.S.C. § 1229(a)(1).

Comparatively, the pre-IIRIRA provision defining an Order to Show Cause instructed immigration officials to provide written notice of the time and place of deportation proceedings "in the order to show cause or otherwise." 8 U.S.C. § 1252b(a)(2)(A) (1994). The inclusion of the qualifying phrase "or otherwise" indicates that an OSC, unlike an NTA, was not required to include the time and place of the immigrant's deportation proceedings, and that this information could be provided in a separate document.[5] *Pereira*, 138 S. Ct. at 2117 n.9 ("[O]rders to show cause did not necessarily include time-and-place information."); *accord Ortiz-Santiago v. Barr*, 924 F.3d 956, 962 (7th Cir. 2019) ("The Order to Show Cause had to include largely the same information as the later Notice to Appear, except that it did not need to specify the time and place of the hearing."); *Jiang*, 18 F.4th at 735 ("In other words, the OTSC statute explicitly acknowledged the permissibility of giving an alien in deportation proceedings notice of the time and place of the hearing by separate document."); *Escobar*, 970 F.3d at 1026–27; *Banuelos v. Barr*, 953 F.3d 1176, 1182 (10th Cir. 2020); *Santos-Quiroa v. Lynch*, 816 F.3d 160, 162 n.2 (1st Cir. 2016) (same).

It necessarily follows that *Pereira*'s logic, which rests on the "clear and unambiguous" mandate that a Notice to Appear include time-and-place information, is inapplicable to an Order to Show Cause, which contains no such requirement. *Pereira*, 138 S. Ct. at 2113; *accord Jiang*, 18

---

[5] Prior to IIRIRA, it was common practice for immigration officials to initiate deportation proceedings with an OSC, and to later furnish an NOH that disclosed this information. *See, e.g.*, *Dobrota v. INS*, 311 F.3d 1206, 1210 (9th Cir. 2002) (discussing the statutory requirements for a pre-IIRIRA NOH).

F.4th at 734–35; *Maradia*, 18 F.4th at 462–63; *Perez-Perez*, 988 F.3d at 375. Accordingly, we hold that an Order to Show Cause that fails to disclose the time and place of an immigrant's deportation proceedings is sufficient to trigger the stop-time rule in a transitional rules case.[6] The immediate result of this holding is that Gutierrez is ineligible for suspension of deportation. As Gutierrez was served an OSC in 1993, only four years after entering the United States, his physical presence is deemed to have ended at that time.

## II. Application for Relief

As Gutierrez is ineligible for suspension of deportation, we turn now to his application for relief. Gutierrez seeks withholding of removal under both asylum law and the Convention Against Torture. "[T]he standards for the two bases of relief are distinct and should not be conflated." *Farah v. Ashcroft*, 348 F.3d 1153, 1157 (9th Cir. 2003). To receive withholding under asylum law, a petitioner must show that "it is more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 1208.16(b)(2); *see also Vasquez-Rodriguez v. Garland*, 7 F.4th 888, 892 (9th Cir. 2021). Comparatively, to qualify for protection under the

---

[6] This holding extends only to an OSC that satisfies the remaining statutory requirements articulated in 8 U.S.C. § 1252b(a)(2)(A) (1994) and any additional prerequisites to trigger the stop time rule prescribed by IIRIRA. This Court expresses no opinion regarding the sufficiency of an OSC that contains additional defects. Nor does this Court opine as to the effect of a defective NOH, such as a notice that inaccurately details the location of an immigrant's hearing or provides an improper date and time.

Convention, a petitioner must demonstrate that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" 8 C.F.R. § 1208.16(c)(2); *see also Lalayan v. Garland*, 4 F.4th 822, 840 (9th Cir. 2021). The Board of Immigration Appeals denied both forms of relief. For the reasons that follow, we hold that the BIA's decision is supported by substantial evidence.

A. <u>Withholding of Removal – Persecution</u>

Gutierrez seeks statutory withholding of removal based on his fear of future persecution in Nicaragua. "To be eligible for withholding of removal, an applicant must demonstrate that [his] life will be 'threatened in that country because of [his] race, religion, nationality, membership in a particular social group, or political opinion.'" *Plancarte Sauceda v. Garland*, 23 F.4th 824, 832 (9th Cir. 2022) (quoting 8 U.S.C. § 1231(b)(3)(A)). "Similar to asylum, a petitioner may establish eligibility for withholding of removal (A) by establishing a presumption of fear of future persecution based on past persecution, or (B) through an independent showing of clear probability of future persecution." *Tamang v. Holder*, 598 F.3d 1083, 1091 (9th Cir. 2010) (citing 8 C.F.R. § 1208.16(b)(1), (2)).

In order to sustain an application for withholding of removal based on future persecution, the applicant's fear of persecution must be "both subjectively genuine and objectively reasonable." *Lolong v. Gonzales*, 484 F.3d 1173, 1178 (9th Cir. 2007); *accord Lalayan*, 4 F.4th at 840. The subjective component may be established through credible testimony evincing a genuine fear of persecution on account of a statutorily protected ground. *See Siong v. INS*, 376 F.3d 1030, 1039 (9th Cir. 2004). The objective component requires the applicant to show that their fear is reasonable by

furnishing "'credible, direct, and specific evidence' that the petitioner faces an individualized risk of persecution or that there is a pattern or practice of persecution against similarly situated individuals." *Lolong*, 484 F.3d at 1178 (quoting *Cordon-Garcia v. INS*, 204 F.3d 985, 990 (9th Cir. 2000)); *see also* 8 C.F.R. § 208.13.

First, Gutierrez claims that he will face persecution in Nicaragua due to his father's opposition to the Sandinista government. To establish future persecution on account of political opinion, the applicant must show that (1) he holds an actual or imputed political opinion; and (2) he faces a likelihood of persecution because of that opinion. *Rodriguez Tornes v. Garland*, 993 F.3d 743, 752 (9th Cir. 2021); *Ahmed v. Keisler*, 504 F.3d 1183, 1192 (9th Cir. 2007). Gutierrez and his father, Julio, credibly testified that Julio took up arms against the Sandinistas in the 1980s. In retaliation for this opposition, Julio was arrested, beaten in custody, and pressed into service by the Sandinista military, before he deserted the army and fled the country in 1988. Consequently, Julio has expressed concern that the Nicaraguan government will realize that Gutierrez is related to Julio and persecute him as a perceived opponent of the Sandinista regime. Gutierrez reflected these concerns secondhand during his deportation hearing.

In support of his application, Gutierrez notes that the Sandinista government has aggressively targeted its political adversaries. This Court has recently observed that "[t]he Sandinista National Liberation Front or 'Frente Sandinista de Liberación Nacional' . . . regained control of the Nicaraguan government in 2007 under Daniel Ortega." *Flores Molina v. Garland*, 37 F.4th 626, 630 (9th Cir. 2022). Gutierrez offers the 2011 Human Rights Report by the State Department, indicating that the Ortega regime has arrested,

imprisoned, persecuted, and killed protesters and dissidents since the Sandinista party returned to power. Among other offenses, this report details arbitrary detentions, excessive force, censorship of the media, and politically motivated killings. *Cf. id.* at 630 ("The Guardian reported that between April and July 2018, it was estimated that over 300 protesters were killed by the police and government operatives.").

The BIA rejected these contentions and concluded that Gutierrez failed to demonstrate "that an anti-Communist, anti-government political opinion would be imputed to him." *Cf. Lolong*, 484 F.3d at 178 (requiring the applicant to show "an individualized risk of persecution"). Substantial evidence supports the BIA's findings, as Gutierrez offers no "credible, direct, and specific evidence" that he would be perceived as an enemy of the Ortega regime and persecuted on account of imputed political opinion. *Id.* As the BIA observed, Gutierrez was "a child of about 8 years when he left Nicaragua," suggesting that "it is unlikely that he would be perceived as having any political opinion at that time." Moreover, in his testimony before the IJ, Gutierrez acknowledged that he has never been involved in a political party, indicating that he has no intention to engage in protests or political activism upon his return. *Cf. Mairena v. Barr*, 917 F.3d 1119, 1126 (9th Cir. 2019).

Additionally, the record reflects that Gutierrez and his family have not faced persecution on account of his father's actions. *Cf. Lolong*, 484 F.3d at 1178 (noting that an applicant may show a likelihood of future persecution through "a pattern or practice of persecution against similarly situated individuals"). Gutierrez, his mother, and his three brothers were able to remain in Nicaragua without incident for eight months after his father deserted the military and fled the country in 1988, and the Nicaraguan

government has since passed a law granting amnesty for political crimes that were committed in the 1980s. Moreover, there is no evidence that Gutierrez's brother Norvin faced political persecution upon his deportation to Nicaragua in 2007. Although Norvin was imprisoned for three weeks upon his return and has allegedly been followed by police, these actions are attributable to his membership in a criminal gang. There is no evidence that Norvin was prosecuted and imprisoned, much less persecuted, on account of actual or imputed opposition to the Nicaraguan government. As the record does not "compel" us to conclude that Gutierrez has been the victim of past persecution or faces a clear probability of future persecution based on imputed political opinion, *Tamang*, 598 F.3d at 1091, substantial evidence supports the BIA's denial of withholding of removal on this ground.

Second, Gutierrez claims that he will be persecuted on account of membership in one of four putative particular social groups. "[T]o establish that a proposed social group is cognizable for purposes of withholding of removal, an applicant must show that the proposed social group is '(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question.'" *Conde Quevedo v. Barr*, 947 F.3d 1238, 1242 (9th Cir. 2020) (quoting *In re M-E-V-G-*, 26 I & N Dec. at 237); *see also Reyes v. Lynch*, 842 F.3d 1125, 1131 (9th Cir. 2016) (discussing the effects of *In re M-E-V-G-*).

"The 'social distinction' prong of the analysis 'refers to social recognition.'" *Conde Quevedo*, 947 F.3d at 1242 (quoting *Rios v. Lynch*, 807 F.3d 1123, 1127 (9th Cir. 2015)). The concept of "social distinction" turns not on "ocular" visibility, but on "the extent to which members of a

society perceive those with the characteristic in question as members of a social group." *In re M-E-V-G-*, 26 I. & N. Dec. at 239–40 (quoting *In re E-A-G-*, 24 I. & N. Dec. 591, 594 (BIA 2008)); *see also In re W-G-R-*, 26 I. & N. Dec. 208, 222 (BIA 2008). This analysis requires an "evidence-based inquiry as to whether the relevant society recognizes [the] proposed social group." *Pirir-Boc*, 750 F.3d at 1084. Carrying this burden ordinarily requires "[e]vidence such as country conditions reports, expert witness testimony, and press accounts of discriminatory laws and policies, historical animosities, and the like." *In re M-E-V-G-*, 26 I. & N. Dec. at 244. Consequently, while the ultimate "particular social group" decision is a question of law that we review *de novo*, "[t]he BIA's conclusion regarding social distinction— whether there is evidence that a specific society recognizes a social group—is a question of fact that we review for substantial evidence." *Conde Quevedo*, 947 F.3d at 1242.

Before the BIA, Gutierrez claimed membership in four putative particular social groups, specifically:

> (1) "Persons fearing gang recruitment";
>
> (2) "Individuals deported from the United States";
>
> (3) "Family members of people who opposed the government in the 1980s"; and
>
> (4) "Persons who the authorities would suspect as being a gang member."

The BIA denied Gutierrez's family-based claim on the same grounds as his political opinion claim. The agency rejected his remaining claims for a lack of particularity and social distinction, finding that "there is nothing in the record that

shows that people who fear gang recruitment, or are suspected of being gang members, are perceived, considered, or recognized by Nicaraguan society to be distinct social groups."

Gutierrez makes no arguments related to the proposed social groups defined as "people fearing gang recruitment" and "individuals deported from the United States" and has therefore waived these claims. *Brown v. Rawson-Neal Psychiatric Hosp.*, 840 F.3d 1146, 1148 (9th Cir. 2016) (instructing that issues "not raised in the appellant's opening brief" are ordinarily waived).[7] His third proposed social group, "family members of people who opposed the government in the 1980s," is coextensive with his imputed political opinion claim and fails for the same reason. While it is generally accepted that "the family remains the quintessential particular social group," *Rios*, 807 F.3d at 1128 (citing *Thomas v. Gonzales*, 409 F.3d 1177, 1180 (9th

---

[7] While these arguments are waived, this Court has previously rejected similar proposed social groups, suggesting that substantial evidence supports the BIA's conclusion that these proposed groups lacked particularity and social distinction. *See, e.g.*, *Reyes v. Lynch*, 842 F.3d 1125, 1139 (9th Cir. 2016) (rejecting particular social group defined as "deportees from the United States to El Salvador"); *Delgado-Ortiz v. Holder*, 600 F.3d 1148, 1150–52 (9th Cir. 2010) (rejecting proposed particular social group featuring "Mexicans returning home from the United States who are targeted as victims of violent crime as a result"); *Barrios v. Holder*, 581 F.3d 849, 854–55 (9th Cir. 2009), *abrogated on other grounds, Henriquez-Rivas v. Holder*, 707 F.3d 1081 (9th Cir. 2013) (rejecting proposed particular social group of "young men in Guatemala who resist gang recruitment"); *Ramos-Lopez v. Holder*, 563 F.3d 855, 862 (9th Cir. 2009), *abrogated on other grounds, Henriquez-Rivas v. Holder*, 707 F.3d 1081 (9th Cir. 2013) (holding that retribution for refusal to join a gang does not constitute persecution on account of a protected ground).

Cir. 2005) (en banc)), the record does not compel the conclusion that Gutierrez would be targeted for persecution based on his father's opposition to the Sandinista government in the 1980s.

Gutierrez's claim that he would be persecuted as a suspected gang member fails for a lack of social distinction. Although this Court has recognized that "persons who are not members of a gang but who are incorrectly perceived to be gang members" may constitute a cognizable social group in some circumstances, *Vasquez-Rodriguez*, 7 F.4th at 898, the applicant bears the burden to demonstrate that the proposed country of removal recognizes the group in question, *Pirir-Boc*, 750 F.3d at 1084. Gutierrez offers nothing beyond his own speculation to suggest that Nicaragua views "those perceived as gang members" as a distinct social identity. *Cf. In re M-E-V-G-*, 26 I. & N. Dec. at 244 (explaining that an applicant must establish social distinction by adducing "evidence such as country conditions reports, expert witness testimony, and press accounts of discriminatory laws and policies, historical animosities, and the like"). Accordingly, substantial evidence supports the BIA's denial of withholding of removal on this ground.

B. Withholding of Removal – Convention Against Torture

The Convention Against Torture provides mandatory relief for any immigrant who can demonstrate that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Hamoui v. Ashcroft*, 389 F.3d 821, 826 (9th Cir. 2004) (quoting 8 C.F.R. § 208.16(c)(2)); *see also Khup v. Ashcroft*, 376 F.3d 898, 907 (9th Cir. 2004) (requiring applicant to demonstrate "at least

a 51% chance" of future torture). Applicable regulations define torture as "an extreme form of cruel and inhuman treatment," requiring the "intentional inflict[ion]" of "severe pain or suffering . . . by, or at the instigation of, or with the consent or acquiescence of, a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1), (2). In conducting this analysis, the agency is to "consider all relevant evidence; no one factor is determinative." *Maldonado v. Lynch*, 786 F.3d 1155, 1164 (9th Cir. 2015) (en banc).[8] However, we review the BIA's denial of CAT relief for substantial evidence. *Nuru v. Gonzales*, 404 F.3d 1207, 1215 (9th Cir. 2005).

Ultimately, Gutierrez's CAT claim suffers from the same deficiencies as his political persecution claim: He alleges that his father's opposition to the Nicaraguan government "will surely subject [him] to harassment and discrimination that in all likelihood will also lead to torture, whether mental or physical," and that he will be "completely ostracized from Nicaraguan society." These contentions are entirely speculative and unsupported by the record. As discussed above, although the Sandinista regime has taken action against political dissidents, Gutierrez offers no evidence he will be perceived as such an adversary or targeted for torture. *See Dhital v. Mukasey*, 532 F.3d 1044, 1051 (9th Cir. 2008) (holding that "the petitioner must demonstrate that he would be subject to a '*particularized threat* of torture'" (emphasis

---

[8] Regulations implementing the CAT instruct the BIA to consider, *inter alia*: (1) "Evidence of past torture inflicted upon the applicant;" (2) "Evidence that the applicant could relocate to another part of the country where he or she is not likely to be tortured;" (3) "Evidence of gross, flagrant or mass violations of human rights within the country of removal;" and (4) "Other relevant information regarding conditions in the country of removal." 8 C.F.R. § 1208.16(c)(3).

in original) (quoting *Lanza v. Ashcroft*, 389 F.3d 917, 936 (9th Cir. 2004))). Gutierrez left Nicaragua over twenty-five years ago, his family was able to reside in the country without issue following his father's departure in 1988, and his brother was not tortured upon his return in 2007.[9] Accordingly, substantial evidence supports the BIA's denial of CAT relief.

## CONCLUSION

For the foregoing reasons, we **DENY** the petition for review.

---

[9] To the extent Gutierrez predicates his CAT claim on fears of gang violence, substantial evidence supports the IJ's conclusion that Petitioner failed to demonstrate that the Nicaraguan government is likely to "acquiesce in any harm gang members might inflict on him."